COMMONWEALTH of Pennsylvania,
Appellee

v.

Paul Aaron ROSS, Appellant.

Superior Court of Pennsylvania.

Argued April 17, 2012.

Filed Oct. 10, 2012.

Thomas M. Dickey, Altoona, for appellant.

Richard A. Consiglio, Assistant District Attorney and Deanne E. Paul, Assistant District Attorney, Hollidaysburg, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, PANELLA, DONOHUE, ALLEN, MUNDY, OLSON, OTT and WECHT, JJ.

OPINION BY DONOHUE, J.:

Appellant, Paul Aaron Ross ("Ross"), appeals from the judgment of sentence dated November 23, 2005 following his convictions for first-degree murder, aggravated assault, involuntary deviate sexual intercourse, unlawful restraint, simple assault, false imprisonment, and indecent assault.[1] For the reasons set forth herein, we conclude that the trial court manifestly abused its discretion in refusing to grant Ross a continuance to permit his newly retained private counsel the opportunity to prepare for trial. In light of our remand for a new trial, we also decide that the trial court abused its discretion in allowing the Commonwealth to introduce the testimony of three of Ross' former romantic partners regarding instances of domestic abuse as "prior bad acts" evidence under Rule 404(b) of the Pennsylvania Rules of Evidence. Accordingly, we vacate the judgment of sentence and remand the case for a new trial.

The relevant factual and procedural background of this case is as follows. At approximately 12:20 p.m. on June 27, 2004, a fisherman on Canoe Creek Lake in Canoe Creek State Park discovered the partially-clothed body of Tina Miller ("Miller") near the lake's second boat launch. Notes of Testimony ("N.T."), 10/28/05, at 105–08. The Blair County Coroner, who arrived on the scene sometime after 2:15 p.m. that afternoon, described the body as being face down, partially immersed in the water with just a shirt, a dark sweater, and knee-high boots on, with her hands duct-taped behind her back (and additional duct tape around her head, mouth, and arms). *Id.* at 33. The Coroner estimated the time of death to be 5:00 that morning.

Dr. Saralee Funke ("Dr. Funke"), the forensic pathologist who performed the au-

---

1. 18 Pa.C.S.A. §§ 2502(a), 2702, 3123, 2902, 2701, 2903, 3126.

topsy the next day, concluded that Miller died of a combination of drowning and strangulation. N.T., 10/31/05, at 432. Injuries to the body included various abrasions to the legs, buttocks, arms, and face, *id.* at 378–88, 400; an abrasion on the right cheek consistent with a blow to the face (but without sufficient force to fracture the skull), *id.* at 394–95, 424; and pattern marks on the left breast consistent with a bite, *id.* at 388–91. Importantly, Miller's anus and vagina were "massively traumatized." *Id.* at 403. Dr. Funke described numerous lacerations to this area of the body, including one "so deep that it went through the sphincter muscle. Tore the sphincter apart and ended up in the vagina." *Id.* at 404. Dr. Funke opined that these particular injuries were likely inflicted through the use of "a significant amount of force" with a foreign object. *Id.* at 404–05.

On the evening of June 26, 2004, Ross and three others (James Fees ("Fees"), Justin Hartman, and Alex Marini) were drinking at a local bar (the Pipe Room). N.T., 10/29/05, at 51–53. There they met Miller. *Id.* at 55. Around 1:30 a.m., the group made their way to Fees' residence, where they continued to drink and play pool. *Id.* at 63–67. Fees later observed Ross and Miller engage in consensual kissing. *Id.* at 78, 154–55. At around 4:30 a.m., Fees offered to drive Ross and Miller home, and he dropped them off together at the second boat launch on Canoe Creek Lake, which was within walking distance of Ross' home. *Id.* at 95. When later questioned by the state police, Ross informed the trooper that he had been at the boat launch with Miller, but that she had made a phone call and soon thereafter a man with a thin beard showed up in a white truck and picked her up. N.T., 11/2/05, at 293–95.

The state police arrested Ross and charged him with the above-referenced crimes. The Commonwealth subsequently filed a Notice of Aggravating Circumstances advising that it would seek the death penalty. The trial court appointed Assistant Public Defender Theodore J. Krol of the Blair County Public Defenders Office to represent Ross. On July 19, 2005, Ross filed a *pro se* motion alleging Attorney Krol's ineffectiveness, including specific allegations that there had been no one-on-one discussions between lawyer and client, that Attorney Krol was too "overburdened with other cases," and that he had exhibited a lack of preparation in arguing important motions (including with respect to the Commonwealth's requests to present prior bad acts testimony by his former romantic partners). Motion for Ineffective Counsel, 7/19/05, at 1. After an evidentiary hearing, on August 20, 2005 the trial court dismissed Ross' motion. Order, 8/20/05, at 1. Still dissatisfied with the performance (or lack thereof) of appointed counsel, Ross retained the services of a private attorney, Thomas M. Dickey ("Attorney Dickey"), who filed his Praecipe for Appearance on October 6, 2005, two weeks prior to the commencement of jury selection on October 21.

On October 17 and October 21, 2005, Attorney Dickey filed two supplemental omnibus pre-trial motions, each requesting a continuance to allow for time to prepare a defense at trial. Supplemental Omnibus Pre–Trial Motions, 10/17/05, 10/21/05. In these motions, Attorney Dickey described in detail his inability to prepare for trial in the time allotted. In particular, through police and expert reports as well as available witness lists, the Commonwealth had made clear that it intended to present a substantial volume of forensic and factual evidence against Ross, including the following:

- Establish the time of death as close to when Fees dropped Ross and Miller off at the boat launch (between 4:30 a.m. and 5:00 a.m.);
- Offer forensic pathological testimony identifying a beer bottle found at the crime scene as the likely weapon used to mutilate Miller;
- Provide testimony to prove that the beer bottle in question had been purchased by Ross earlier that evening at the Pipe Room;
- Analysis of blood serology, hair samples, and soil samples, all collected from the crime scene;
- Match casts of shoe prints near the crime scene with a particular brand of shoe known to be regularly worn by Ross;
- Match casts of boot prints at the crime scene with boots worn by Miller on the night of the crime;
- Offer expert testimony to explain why no fingerprints or DNA samples were collected at the crime scene (*e.g.*, the location of the body in water, sun and other environmental factors);
- Call a forensic odontologist to match the bite marks on Miller's breast to dental impressions of Ross' teeth, and in so doing exclude other possible perpetrators;
- Offer medical testimony that the scratches and other wounds observed on Ross' legs were the result of a struggle with Miller, rather than from biking as Ross' had claimed;
- Provide a "bruise progression" analysis through a series of photographs;
- Present witnesses to dispute Ross' claim that Miller called a boyfriend

who picked her up at the boat launch, including through testimony that she did not have a cell phone that night and did not have a boyfriend at that time;

- Present testimony from a former cellmate claiming that Ross confessed to him;
- Offer prior bad acts testimony from three of Ross' former romantic partners, to the effect that he committed violence towards them during their relationships.

In significant contrast to the Commonwealth's preparedness, as of the first day of jury selection on October 21, 2005, the defense had retained just two witnesses who would testify at trial—Dr. Lowell Levine, a forensic odontologist to testify regarding the bite marks, and Dr. Eric Vey, a forensic pathologist, to testify primarily regarding time of death and weapon identification.[2]  At this time, Drs. Levine and Vey were in the process of collecting and reviewing evidence received from the Commonwealth and Attorney Dickey, but neither had completed their work, prepared reports, or conveyed any findings or opinions to Attorney Dickey.  Supplemental Omnibus Pre–Trial Motion, 10/21/05, at ¶ 18.  Moreover, and more importantly, the defense had not retained any expert to review or analyze the bulk of the evidence collected at the crime scene or at Ross' residence—including blood serology, hair samples, soil samples, or the shoe and boot castings.  Likewise, the defense had no expert to review the evidence collection methods utilized by police officers or to analyze critically the Commonwealth's contention that environmental conditions at the crime scene prevented the collection of

---

**2.**  Former counsel had retained a third expert, a DNA analyst, but he performed no work

because there was no DNA evidence.

fingerprint or DNA evidence. Finally, no expert for the defense had either reviewed the more than 225 photographs taken at the crime scene or studied the video tapes documenting the collection of evidence.

The trial court denied both of Attorney Dickey's motions for continuance, but on October 24, just four days prior to the start of trial, the trial court did authorize Attorney Dickey to retain a criminologist, Larry Dehus, to review the Commonwealth's evidence. Order, 10/24/05, at 6. It authorized a budget of up to $7,000 to pay Dehus for his services, "provided his report is provided no later than October 31, 2005." *Id.* The trial court also ordered the State Police to turn over its evidence to Dehus for review. *Id.*

On October 28, however, the first scheduled day of trial, Attorney Dickey filed a third motion for continuance. Attorney Dickey indicated that Dehus had received some, but not all, of the Commonwealth's evidence, and had not completed his review or analysis. Supplemental Omnibus Pre–Trial Motion, 10/28/05, at ¶¶ 2–3. Attorney Dickey further advised the trial court that his other two experts, Drs. Devine and Vey, had likewise not completed their work and/or conveyed their findings or opinions to him. *Id.* at ¶ 6. Attorney Dickey noted that he had not had time to interview any of the more than 50 witnesses who had spoken with the State Police, many of whom were listed as potential fact witnesses at trial. *Id.* at ¶ 5. Finally, he indicated that he had not been able to meet with his appointed investigator in efforts to identify or interview potential witnesses to testify on Ross' behalf. *Id.* at ¶ 4. In conclusion, Attorney Dickey stated that he could not give an opening statement at trial given his current lack of preparedness. *Id.* at ¶ 7.

The trial court denied this third motion for continuance, and trial commenced as scheduled on Friday, October 28. During opening arguments, the Commonwealth described some of the forensic evidence that it intended to introduce, including the shoe and boot castings, odontological evidence regarding matching the bite mark to Ross' dental impression, and medical testimony regarding Ross' injuries. In contrast, Attorney Dickey did not advise the jury what evidence he would be presenting, or even that he would present any evidence. Instead, he asked the jury to keep an open mind and make the prosecution prove its case, including scrutinizing carefully all of the Commonwealth's evidence. N.T., 10/28/05, at 27. Thereafter, at trial the Commonwealth called 10 expert witnesses and 36 fact witnesses during seven days of testimony from October 28 until November 7. In his case-in-chief on November 8–9, Ross called three expert witnesses and nine fact witnesses. After approximately two hours of deliberation, the jury returned guilty verdicts against Ross on all charges.

At the sentencing phase of the trial, the jury rejected imposition of the death penalty. The trial court then proceeded to sentence Ross to life in prison plus 24 to 48 years. Ross filed post-trial motions, which the trial court denied on January 30, 2006. On February 10, 2006, Ross filed a timely notice of appeal, but Ross' counsel failed to file an appellate brief and the appeal was consequently dismissed. On September 26, 2008, Ross filed a PCRA petition seeking the reinstatement *nunc pro tunc* of his direct appeal rights, which the trial court granted on August 14, 2009.

This direct appeal followed, in which Ross raises the following issues for our consideration:

1. Did the [trial] court abuse its discretion in failing to grant [Ross'] *pro se* and trial counsel's reasonable requests for a continuance in order to interview wit-

nesses; obtain experts; review reports; etc. when it denied motion(s) for continuance, the same resulting in a violation of [Ross'] rights to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

2. Did the [trial] court abuse its discretion by admitting improper character evidence and permitting the testimony of certain 'bad act' witnesses including Laura Maloney, Deborah Levine and Elizabeth Berardinelli?

Appellant's Brief at 3.

■ With respect to Ross' first issue on appeal, the grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. *Commonwealth v. Boxley,* 596 Pa. 620, 628, 948 A.2d 742, 746, *cert. denied,* 555 U.S. 1003, 129 S.Ct. 506, 172 L.Ed.2d 372 (2008). An abuse of discretion "is not merely an error of judgment; rather, discretion is abused when 'the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record.'" *Commonwealth v. Randolph,* 582 Pa. 576, 583–84, 873 A.2d 1277, 1281 (2005), *cert. denied,* 547 U.S. 1058, 126 S.Ct. 1659, 164 L.Ed.2d 402 (2006); *Commonwealth v. Thomas,* 879 A.2d 246, 261

(Pa.Super.2005), *appeal denied,* 605 Pa. 685, 989 A.2d 917 (2010). A bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion. *Commonwealth v. Ah Thank Lee,* 389 Pa.Super. 201, 566 A.2d 1205, 1206 (1989), *appeal denied,* 527 Pa. 615, 590 A.2d 756 (1990). Instead,

[a]n appellant must be able to show specifically in what manner he was unable to prepare his defense or how he would have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice.

*Commonwealth v. Brown,* 351 Pa.Super. 119, 505 A.2d 295, 298 (1986).[3]

■ In its written opinion, the trial court contended that Ross did not satisfy the *Brown* standard. Trial Court Opinion, 1/30/06, at 4. While the trial court acknowledged that from the time of the entry of Attorney Dickey's appearance until the start of trial, Ross requested "multiple continuances for a multitude of reasons," the trial court asserted that Attorney Dickey "neither stated then nor does he state now specifically how he would have prepared differently had he been given more time." *Id.* Our review of the certified record on appeal reflects to the contrary. Ross' written continuance motions set forth in considerable detail the areas in

---

**3.** In his appellate brief, Ross applies the factors test set forth by this Court in *Commonwealth v. Prysock,* 972 A.2d 539, 543 (Pa.Super.2009), in arguing that the trial court erred in refusing to grant a continuance in this case. We decline to do so, as the issue in *Prysock* was whether the trial court erred in refusing to grant a continuance to permit the appellant to retain private counsel (potentially violating his constitutional right to counsel of one's choice). *Id.* at 542. In *Prysock,* unlike in the present case, the trial court's refusal to grant a continuance resulted in the appellant

being represented at trial by counsel not of his own choosing and with whom he was dissatisfied. *Id.* at 543. Accordingly, the *Prysock* factors test was part of a balancing test designed to weigh an appellant's right to retain counsel of his choice versus the Commonwealth's interest in the swift administration of justice. *Id.* at 545. Because Ross proceeded to trial with the counsel of his choice, no such similar conflict exists here and *Prysock* factors test is not appropriately applied.

which the Commonwealth intended to present evidence at trial, but for which appointed counsel had neither obtained expert witnesses nor made any sustained effort to prepare a cogent response.[4] For example, the October 17 motion for continuance explained that the Commonwealth had submitted reports on "hair samples, serology results, shoe testimony, shoe prints, soil results, bite marks, DNA, etc." Supplemental Omnibus Pre–Trial Motions, 10/17/05, at ¶ 14. The motion further noted that the Commonwealth planned to introduce the testimony of a doctor to testify regarding the scratches and abrasions on Ross' body. *Id.* at ¶ 15. As a result, Ross advised the trial court that "[i]n the event the [c]ourt would permit the inclusion of these opinions, the defendant would need to have additional experts appointed including but not limited to a criminologist." *Id.* at ¶ 16. For these reasons, the motion requested a continuance "in order for the defendant to rebut the Commonwealth's findings and opinions," including the appointment of additional experts. *Id.* at ¶ 17.

Ross' October 21 motion for continuance made similar requests for the appointment of expert witnesses and further indicated that the experts that had been retained by appointed counsel had not received the necessary physical evidence from the Commonwealth to complete their work. Supplemental Omnibus Pre–Trial Motions, 10/21/05, at ¶¶ 2–6. In requesting a continuance for one trial term, or in the alternative one week,[5] Attorney Dickey advised

4. In the October 17 motion for continuance, Attorney Dickey requested that, notwithstanding the family's hiring of private counsel, the trial court retain the appointments of Ross' expert witnesses. The Dissent contends that this shows that Attorney Dickey was "not dissatisfied" with the selection of experts by prior appointed counsel (Attorney Krol). Nothing in the certified record on appeal, however, supports this contention, as the far more reasonable assumption is that Attorney Dickey sought the continued retention of the experts because without them, given the family's limited financial situation, he would have no experts at all to testify at trial.

In this regard, we note that a review of the record on appeal suggests that Attorney Dickey may not have been entirely satisfied with the selection of Dr. Levine as Ross' forensic odontologist. During questioning as to Dr. Levine's qualifications, the Commonwealth interrogated him at length regarding his testimony in a recent Massachusetts case where he testified on behalf of the prosecution. In that case, Dr. Levine opined that there was a "high degree of probability" that a bite mark had been made by the defendant. N.T., 11/9/05, at 236. The defendant thereafter spent 41 days in jail, until DNA evidence proved that he had in fact not caused the bite mark. *Id.* at 238. This evidence may well have undermined Dr. Levine's credibility with the jury, and a different expert in the field may have been a more effective witness.

5. The learned Dissent argues that the alternative request for a continuance of one week reflects that Attorney Dickey did not require a significant amount of time to complete preparation of Ross' defense for trial. Dissenting Opinion at 109. We disagree. Each of the three motions for continuance describes in detail the substantial volume of preparation still required to be ready to defend Ross in light of the significant quantity of forensic and other evidence expected to be introduced by the Commonwealth at trial. None of Attorney Dickey's representations to the trial court in these three motions for continuance can fairly be interpreted as an indication that a week would be a sufficient amount of time to prepare for trial.

Moreover, a careful review of the three motions for continuance shows that the alternative requests for shorter delays were not estimates of the time that was needed for preparation, but were merely entreaties for **any** additional time, even if insufficient to do a thorough job. As the trial court denied each of Ross' three pre-trial motions for continuances, the next motion contained additional (and shorter) alternative requests. In the October 17 motion, Attorney Dickey made an open-ended request for "a continuance in order for the Defendant to rebut the Commonwealth's findings and opinions."

the trial court that he could not give an opening statement at trial without first having received and reviewed the reports of his expert witnesses, which would not be available at the scheduled start of trial. *Id.* at 19–20.

Ross' October 28 motion for continuance included similar requests, and also made clear that defense counsel still had not had time to meet with any of the over 50 witnesses that had been interviewed by the state police. Supplemental Omnibus Pre–Trial Motion, 10/28/05, at ¶ 4. Attorney Dickey also advised the trial court that he had not had ample time to meet with his own experts or to locate or interview potential witnesses who could be called in Ross' defense. *Id.* at ¶¶ 3–8. Consequently, based upon our review of the record on appeal, Ross and Attorney Dickey did inform the trial court "specifically in what manner he would be unable to prepare his defense" without a continuance and "how he would have prepared differently had he been given more time." *Brown,* 505 A.2d at 298.

We likewise conclude that the trial court's refusal to grant a continuance resulted in prejudice to Ross. Attorney Dickey had to give his opening statement to the jury without knowing the opinions of his expert witnesses, one of whom (Dehus) had been retained within days of the start of trial and was still reviewing the bulk of the Commonwealth's physical evidence and formulating opinions as the trial proceeded.[6] More importantly, Attorney Dickey was required to cross-examine (to the extent possible) Commonwealth experts without having received the opinions of his own experts. For example, the Blair County Coroner testified that based upon her testing (including analysis of rigor mortis and lividity, water, ambient air, and body temperatures, and ante- and post-mortem injuries) that the time of death was 5:00 a.m. N.T., 10/28/05, at 55–56. Although the issue was being reviewed by Ross' newly retained criminologist expert at the time of the Coroner's testimony, Attorney Dickey advised the trial court that he had not received a report from his expert. *Id.* at 26 ("... now I have to cross-examine her and I don't have any material."). As such, the cross-examination of the Coroner on this important issue (which placed Ross at the scene at or around the time of death) was necessarily limited to questions regarding Dr. Funke's autopsy report (which did not estimate time of death) and the extent to which 5:00 a.m. was an estimate (the Coroner agreed that it was, and gave an possible range of

Supplemental Omnibus Pre–Trial Motion, 10/17/05, at ¶ 17. After denial of this continuance, the October 21 motion requested a continuance of one trial term, or "at a minimum ... no less than one week." Supplemental Omnibus Pre–Trial Motion, 10/21/05, at ¶ 19. And after denial of this continuance, the October 28 motion requested "a continuance of one trial term; and/or in the alternative a continuance for one full week from the date of filing of said motion; and/or in the alternative a continuance until Monday, October 31, 2005." Supplemental Omnibus Pre–Trial Motion, 10/28/05, at ¶ 9.

6. While it is true, as the Dissent indicates, that Dehus' billing records show that he completed his work by October 31, the certified record on appeal reflects that this is likely inaccurate. At trial, Dehus testified that he continued to receive items for evaluation up until the day before his testimony. N.T., 11/8/05, at 175. Moreover, in its response to Ross' post-trial motions, the Commonwealth admits that it continued to send evidence to Dehus for review "while the trial was ongoing." Response to Defendant's Post–Trial Motions, 12/13/05, at 2. For these reasons, a more likely explanation for Dehus' failure to include time entries for work performed after October 31 may be the trial court's suggestion, at the time of retention, that Dehus would only be paid if he completed his work by October 31. Order, 10/24/05, at 6.

two hours in either direction). *Id.* at 62–63, 81–84.

In this same regard, the lack of assistance from experts is further reflected by the later testimony of Dr. Vey, Ross' forensic pathologist. Dr. Vey disagreed with the Coroner's 3:00 a.m. to 7:00 a.m. window for the time of death, noting an important difference between the Coroner's finding of "fixed lividity" anteriorly and the autopsy report's notation of the presence of lividity shifting into the victim's neck after the body was flipped from front to back prior to conducting the autopsy. N.T., 11/9/05, at 29. According to Dr. Vey, "fixed lividity won't shift," and thus the Coroner was incorrect in using a finding of "fixed lividity" in her estimate of the time of death. *Id.* at 29–30. For this reason, Dr. Vey estimated that the time of death could have been as late as 12:30 p.m., or within a half hour of discovery of the body—a finding far more favorable to Ross. During his cross-examination of the Coroner, however, Attorney Dickey apparently did not have this information, as he asked no questions about the "fixed lividity" discrepancy.

The learned Dissent contends that the billing records of Ross' experts show that their work was completed in time to assist in Ross' defense. Dissenting Opinion at 110. The Dissent is correct that the billing records show that Ross' experts completed their work prior to their trial testimony (November 8–9), and that, frankly, they did not bill considerable amounts of time in doing so.[7] However, the Dissent's focus on the limited number of hours billed by Ross' experts prior to their trial testimony is misplaced in this circumstance, since the issue here is not whether the experts had a sufficient amount of time to review the evidence and devise their opinions prior to their testimony on November 8–9. They did. Instead, the issue presented is whether the trial court's failure to grant a continuance of the trial created a situation where Ross' counsel did not have a sufficient amount of time to consult with the expert witnesses prior to the start of trial and to incorporate their opinions into a cohesive strategy to defend Ross.

Neither the billing records nor any other evidence of record establishes that Ross' experts assisted in the preparation of Ross' defense, either prior to or during trial. In particular, the billing records reflect that none of Ross' three experts attended trial on the days when the Commonwealth's corresponding experts testified, and thus none of them was present to assist Attorney Dickey with cross-examinations.[8] The billing records likewise

---

7. For example, while the Commonwealth's forensic odontologist, Dr. Asen, worked for nearly 15 months and billed the Commonwealth more than $20,000 ($195/hour), Dr. Levine billed a mere 8 hours to review the evidence prior to his testimony on November 9.

8. In its substituted appellate brief on reargument *en banc*, the Commonwealth indicates that "the record appears to establish that Mr. Dehus was physically present in the Courtroom during the testimony of most of the Commonwealth's witnesses." Substituted Brief on Reargument for Appellee at 30. The Commonwealth's basis for this assertion is a comment made to the trial court on October

28 during a discussion of when Dehus would be returning the physical evidence so that it could be admitted into evidence and used by the Commonwealth's witnesses at trial. Attorney Dickey indicated that Dehus might be in court on October 31 and could bring the evidence with him then. N.T., 10/28/05, at 116.

Further review of the record on appeal, however, indicates that Dehus was not in court on October 31, or any other day prior to the time of his testimony on November 8. Dehus' billing records reflect that he did not travel to Blair County until November 7. Moreover, Dehus' testified that a police officer, Officer Prendergast, picked up the evidence from his

reflect that none of Ross' three expert witnesses prepared a written report or otherwise transmitted any written summary of their findings and opinions to Attorney Dickey in advance of their testimony. Finally, and significantly, the billing records of Ross' experts do not reflect that they communicated with Attorney Dickey during the trial. For example, from the time of his retention on October 24, the only reference on Dehus' billing record to any consultation with Attorney Dickey is a "Pre-trial Meeting" on November 8, *the day of his trial testimony*— with no charges for any time spent on phone calls, email, or other correspondence with Attorney Dickey. Dr. Vey's billing records make no mention at all of any correspondence with Attorney Dickey. Dr. Levine's billing records reference only a "Consultation" on November 9, the day of his trial testimony.[9] Finally, nothing in the billing records contradicts Attorney Dickey's representation, as set forth in the October 28 motion for continuance, that Ross' experts were still reviewing evidence at that time and that he was not yet in possession of the results of their work. Supplemental Omnibus Pre–Trial Motion, 10/28/05, at ¶¶ 2–7.

Contrary to the Dissent's indication that it "strains credulity" to think otherwise, Dissenting Opinion at 111, the lack of consultation between Attorney Dickey and the expert witnesses is entirely understandable given the lack of available time to do so. From the start of jury selection on October 21, Attorney Dickey was in court six days a week, Monday through Saturday, typically from 8:30 a.m. until 4:00—

4:30 p.m.[10] N.T., 10/28/05, at 216–17. As the trial court observed, Attorney Dickey worked over lunches, weekends (Sundays), and into the evenings. Trial Court Opinion, 2/2/06, at 5. It is thus obvious that he lacked the time to engage in significant consultation with his expert witnesses. Ross' experts could not function as aides in the preparation of his defense because there simply was no time for it. As the experts' billing records reflect, to the extent that there was correspondence, it was sufficiently minimal that the experts did not include any charges for them.

Ross was also prejudiced by Attorney Dickey's inability to conduct further investigation into possible defenses. As the written motions for continuance made clear, Attorney Dickey had no time or opportunity to interview more than 50 witnesses contacted by the state police during the investigation into Miller's death. Moreover, Attorney Dickey had no ability to investigate and/or prepare defenses potentially available to Ross. For example, Ross advised the police that Miller had been picked up by a bearded male in a white pickup truck, and some evidence suggested that there were unidentified tire tracks and shoe prints near the scene of the murder. *See, e.g., N.T.,* 10/31/05, at 346. Given the lack of time, however, counsel had no opportunity to attempt to develop these defenses.

The Dissent notes that Attorney Dickey was able to identify some witnesses in Ross' defense. Dissenting Opinion at 112. The certified record on appeal, however,

---

laboratory in Ohio on November 1. N.T., 11/8/05, at 68.

9. Dr. Levine's billing records include a general reference to "telephone consultations" between June–November 2005, without specifically indicating whether these consultations were with Attorney Krol or Attorney Dickey.

10. The only exceptions were October 26–27, which represents the time between the completion of jury selection and pre-trial motions on October 25, and the start of trial on October 28.

reflects the haphazard approach Attorney Dickey was forced to use to accomplish this rudimentary trial preparation task. After the lunch recess on November 8 (the first day of Ross' case-in-chief), Attorney Dickey advised the trial court that:

> Here's the problem and you know I've never even talked to these witnesses. I am literally interviewing them and making a determination whether we're going to use them or not all in a matter of like fifteen minutes.... I'm so ... I'm running crazy chasing my tail. Okay, who's this witness, what did she say, okay, who put them on the stand, is he good or not good, in like five minutes and I can't do that.

N.T., 11/8/05, at 125–28. It was prejudicial to Ross not to provide his counsel with a reasonable amount of time to develop and prepare a defense *prior to trial*, particu-larly given the severity of the charges and possible sentence.

■ In light of the multiple factually supported entreaties by trial counsel for continuances in this capital murder case, the trial court failed to provide any good reason for denying Ross' motions for continuance. The trial court's written opinion lists five witnesses who, "according to the Commonwealth," might not be able to appear at a later scheduled trial. Trial Court Opinion, 1/30/06, at 4. The certified record on appeal contains no support for the potential unavailability of any such witnesses. Similarly, the trial court indicated that upon entering his appearance, Attorney Dickey advised that he was confident that he would be ready to go to trial on schedule. *Id.* No such statement appears in the certified record on appeal, however, and therefore, this Court may not consider it.[11] *See, e.g., Commonwealth v. Rush,* 959

---

11. The Commonwealth in its appellate brief on *en banc* review filed an "appendices of documents" *dehors* the record, which it then cites in its brief as support in part for its argument on appeal that Attorney Dickey was associated in practice with Attorney Krol. Commonwealth Substituted Brief on Reargument, at 4 n. 1. These documents were never authenticated or admitted into evidence at trial, and may not be considered in deciding this appeal. *See, e.g., Commonwealth v. Crawley,* 541 Pa. 408, 417 n. 9, 663 A.2d 676, 681 n. 9 (1995) (documents attached to appellate brief that were not offered into evidence or a part of the certified record may not be considered in deciding appeal), *cert. denied,* 517 U.S. 1212, 116 S.Ct. 1832, 134 L.Ed.2d 936 (1996).

Our Rules provide a procedure to correct or modify a certified record when properly included documents were omitted. *See* Pa. R.A.P. 1926. The Commonwealth made no attempt to avail itself of this procedure. It is beyond discussion that where documents or other items were never introduced in the trial court, a party may not circumvent both the Rules of Evidence *and* the Rules of Appellate Procedure by merely attaching the unadmitted evidence to an appellate brief.

We recognize that the learned Dissent has identified isolated docketed papers showing that Attorney Krol and Attorney Dickey sometimes worked in the same office and were apparently professionally associated for some purposes. Dissenting Opinion at 105. From these papers, the Dissent draws the conclusion that "Attorney Dickey was involved in Ross' defense well in advance of Attorney Dickey's formal entry of appearance." *Id.* at 106. First, the trial court made no such finding or allusion to such a conclusion. Second, the record clearly reflects that Attorney Krol was appointed to represent Ross in his role as a member of the Public Defender's Office, that he received service of filings by the District Attorney at the Public Defender's Office at the Blair County Courthouse, and that he typically signed documents filed on Ross' behalf as "Theodore F. Krol, Esquire, Assistant Public Defender." *See, e.g.,* Transcript of Docket, 10/13/04, at 1; Proof of Service, 12/8/04; Omnibus Pre-Trial Motion, 1/27/05, at 3. As such, the record demonstrates that Attorney Krol represented Ross in his role as an assistant public defender, and not as a lawyer in private practice (either as Attorney Dickey's associate, partner, or otherwise).

A.2d 945, 949 (Pa.Super.2008) ("This Court does not rely on items dehors the record, such as assertions in an appellate brief or a trial court opinion.") (quoting *Commonwealth v. Wrecks*, 931 A.2d 717, 722 (Pa.Super.2007)), *appeal denied*, 601 Pa. 695, 972 A.2d 521 (2009). Moreover, the trial court's reliance on Attorney Dickey's prior representation was insufficient under these circumstances since, even if Attorney Dickey originally believed that a postponement would not be necessary, his detailed requests for continuances required the trial court's reconsideration in light of counsel's new understanding of the case.

The trial court also maintained that it had worked together with the Commonwealth "to accommodate [Ross'] requests to assure defense counsel's preparedness:"

> For example, the Commonwealth gave defense counsel reports and other documents that were misplaced during the transfer of attorneys; we ordered the Pennsylvania State Police to produce the crime scene log, mapping review and 'bruise progression' photographs; we also appointed Larry M. Dehus, a forensic scientist, as an expert for the defense, October 24, 2005; we further ordered the Pennsylvania State Police to physically transport evidence to Mr. Dehus by October 24, 2005; moreover, after jury selection we delayed the evidentiary phase of trial by a day and a half to allow defense counsel adequate time for trial preparation.

Trial Court Opinion, 1/30/06, at 4.

Rather than assisting defense counsel, the trial court's actions essentially created a "fire drill" scenario, in which defense counsel was required to review a plethora of evidence to prepare for trial at the same time he and his experts were still receiving physical evidence and attempting to formulate responses to the Commonwealth's well-developed forensic case. At the very least, the filing of a third written motion for continuance on the first day of the evidentiary phase of trial (October 28, 2005), should have alerted the trial court that its efforts to "allow defense counsel adequate time for trial preparation," including a one and one half day delay, had not adequately served their purpose. At the start of trial, the record on appeal unquestionably establishes that the trial court was aware that defense experts had not yet formulated opinions on key issues like Miller's time of death, and that as a result Attorney Dickey's ability to defend Ross against multiple charges—including first-degree murder with a possible death sentence—was seriously compromised. The record on appeal does not reflect any support for a contention that Ross' motions for continuance were merely efforts to delay, as no prior continuances had been granted at any time to any party.

For these reasons, we conclude that the trial court manifestly abused its discretion in denying Ross' multiple motions for continuance in the weeks prior to the start of trial. In exercising its discretion in a criminal case, the trial court should pay careful attention to the nature of the crimes at issue and the level of intricacy of the evidence to be presented by the parties. *Commonwealth v. Scott*, 469 Pa. 258, 264, 365 A.2d 140, 143 (1976). Ross faced first-degree murder charges, for which the Commonwealth was seeking the death penalty. The trial court acknowledged that there were no eyewitnesses to Miller's murder, and that as a result the Commonwealth's case was "highly circumstantial," "highly contested," and based extensively on forensic evidence. N.T., 10/31/05, at 334.

This Court has indicated that a "myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an

empty formality." *Commonwealth v. Prysock*, 972 A.2d 539, 542 (Pa.Super.2009) (quoting *Commonwealth v. Robinson*, 468 Pa. 575, 593–94, 364 A.2d 665, 675 (1976) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964))). Because the record in this case reflects that the trial court's denial of Ross' multiple motions for continuance were based on a "myopic insistence upon expeditiousness" without any reasonable basis for delaying the trial for a single trial term, we vacate the judgment of sentence and remand the case for a new trial.

The trial court's observation that Attorney Dickey did an excellent job in taking the case on short notice and working diligently for Ross does not alter our conclusion here.[12] While our review of the record likewise reflects that Attorney Dickey did the best job that he could in representing Ross under the circumstances presented, he undoubtedly could have done a more effective job if he had been permitted adequate time to prepare a defense. Instead, as a result of the trial court's unreasonable insistence on rushing the case to trial, Attorney Dickey was put in the untenable position of having to prepare his case at the same time that he was trying it. Given the severity of the charges and the complexity of the evidence in this case, the trial court manifestly abused its discretion in refusing to grant Ross' multiple requests for a continuance.

In light of our remand for a new trial, we also reach Ross' second issue on appeal wherein he argues that the trial court erred in admitting the testimony of three of Ross' former romantic partners, all of whom testified to acts of violence committed by Ross during their relationships with him. Ross contends that this "prior bad acts" testimony is barred by Rule 404(b)(1) of the Pennsylvania Rules of Evidence. We agree.

■ In *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483 (2009), our Supreme Court summarized the relevant law in this area as follows:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa. R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008).

*Id.* at 114, 982 A.2d at 497.[13] The Commonwealth must prove beyond a reason-

---

12. "In this Court's eighteen years on the bench[,] we have seen few attorneys who could have taken a capital murder case a few weeks before trial, with the complexity of this case, and have represented [Ross] as diligently and with such informed zealousness as this defense counsel. The record speaks for itself." Trial Court Opinion, 1/30/06, at 5.

13. Pa.R.E. 404(b), entitled "Other crimes, wrongs, or acts," provides in relevant part as follows:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case

able doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts. *Commonwealth v. Stanley*, 484 Pa. 2, 7, 398 A.2d 631, 633 (1979); *Commonwealth v. Constant*, 925 A.2d 810, 821 (Pa.Super.), appeal denied, 594 Pa. 675, 932 A.2d 1285 (2007).

The trial court permitted the Commonwealth to introduce the testimony of Elizabeth Berardinelli ("Berardinelli"), Laura Jane Maloney ("Maloney"), and Deborah Amy Levine ("Levine") to prove motive, intent, identity, and common plan, scheme, or design. Berardinelli testified that she and Ross lived together in State College, Pennsylvania from August 1995 through March 1996. N.T., 10/29/05, at 8. During this time, Berardinelli testified that Ross would on occasion spit, yell, and slap her. *Id.* at 9. In March 1996, Berardinelli described an incident that occurred at their home while they were having intercourse with each other. *Id.* at 12. According to Berardinelli, Ross took a hair spray bottle, covered it with a condom, and inserted it inside her. *Id.* After a few minutes of use, Berardinelli testified that Ross became upset that she was "having pleasure from it" and became violent with her. *Id.* He threw her against a wall, punched her in the face, and pulled her hair. *Id.* Berardinelli immediately left the home, and she later filed for and obtained a protection from abuse ("PFA") order against Ross. *Id.* at 14.

Maloney met Ross in March 2003, and the two were married on July 21, 2003, at which time Maloney was pregnant with his child. N.T., 11/4/05, at 24. On August 13, 2003, Maloney testified that Ross came home at around 2:00 a.m. after she was already in bed. *Id.* at 25. Ross, "reeking of alcohol," came into the bedroom where Maloney was sleeping, woke her, and proposed that they have sex. *Id.* at 26. Maloney testified that she refused his request, and that Ross then took a dildo and began rubbing it outside her long skirt between her thighs. *Id.* at 27. Maloney asked him to stop, left the bedroom, and went into the kitchen. *Id.* Ross followed her and began screaming that she should respect his privacy "because I had looked into his bag that he had brought home that night." *Id.* at 28. According to Maloney, Ross then cleared the kitchen table, flipped it over, and began throwing the chairs (not at her). *Id.* He then slammed her against the wall and "proceeded to choke me and punched me in the mouth and I was bleeding from my top and bottom lips." *Id.* Maloney testified that Ross continued to throw her around and choke and punch her until "there was a point where he, for some reason, decided that it was time to get dressed and left." *Id.* at 29. Maloney called 911, received medical treatment for her injuries, and obtained an emergency PFA. *Id.* at 30. Ross pled guilty to domestic violence charges. *Id.* at 31. Maloney testified that she later gave the baby up for adoption "for fear of her safety." *Id.* at 30.

Levine testified that she met Ross in January 2004 and soon moved in with him. *Id.* at 38. They obtained a marriage license in February 2004, but one night before they were to be married Levine testified that Ross tied her to their bed with shoelaces, covered her eyes with a bandana, and forced her to engage in oral and anal sex. *Id.* at 39. Levine also related that there were instances of the use of a dildo during sex without her con-

---

only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b)(1)-(3).

sent, and that on some occasions Ross would physically assault her during intercourse. *Id.* at 40–41, 47 ("Punch me in the face, not stop when I told him to."). In early March 2004, Levine testified that Ross became violent with her, grabbing her by the hair, throwing her against a wall, and punching her in the face. *Id.* at 41. On a subsequent occasion, he choked her to the point where she could not breathe, though she did not seek medical attention in response. *Id.* at 41–42. Finally, on March 24, 2004, Levine indicated that Ross punched her in the head, at which time the neighbors called the police. *Id.* at 42. Ross was arrested and later pled guilty to simple assault. *Id.* at 43.

■■■■ The trial court permitted the testimony of these three witnesses under multiple exceptions to the prohibition of prior bad acts evidence under Rule 404(b)(1).[14] First, the trial court found that the testimony of Berardinelli, Maloney, and Levine was admissible to prove motive. Trial Court Opinion, 4/13/05, at 4. To be admissible under this exception, there must be a specific "logical connection" between the other act and the crime at issue which establishes that "the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Martin*, 479 Pa. 63, 68–69, 387 A.2d 835, 838 (1978) (quoting *Commonwealth v. Schwartz*, 445 Pa. 515, 522, 285 A.2d 154, 158 (1971)). In *Martin*, for example, thirteen days prior to his murder, the victim had struck the appellant with a chair when the appellant was attempting to rob others. Our Supreme Court determined that this incident constituted a possible motive for the subsequent murder, as "the killing grew out of or was in some way caused by the prior incident." *Id.* at 69, 387 A.2d at 838.

In the case *sub judice*, the trial court found a "logical connection" based upon the "many similarities between the prior bad acts of the defendant and the killing of Tina Miller." Trial Court Opinion, 4/13/05, at 6. In this regard, the trial court identified the following similarities:

(a) defendant was drinking in three out of four assaults on previous women, defendant was also allegedly drinking the night of the Miller death; (b) defendant choked or used force against the throat of three of the four women, Tina Miller's body had hemorrhages to the neck; (c) sexual assault was attempted on one victim and perpetrated against three of the four women, sexual assault was carried out upon Tina Miller's body; (d) four of the four women expressed fear of being killed by the defendant, circumstantial evidence can be argued to allege Miller was in fear of being killed while the assault was being carried out;[15] (e) physical assault to the face and head was committed against three of the four women, Tina Miller had hemorrhages to

14. The admissibility of evidence is a matter solely within the discretion of the trial court. This Court will reverse an evidentiary ruling only when a clear abuse of discretion has occurred. *See, e.g., Commonwealth v. Johnson*, 536 Pa. 153, 157, 638 A.2d 940, 942 (1994); *Commonwealth v. Foy*, 531 Pa. 322, 325, 612 A.2d 1349, 1351 (1992).

15. The record on appeal does not support the trial court's findings with respect to (c) and (d). Only Levine testified to what may properly be described as a "sexual assault." While both Berardinelli and Maloney explained that they suffered physical assaults connected in some way to sexual episodes with Ross, neither of these witnesses testified that they were the victims of non-consensual sexual assaults. In addition, neither Berardinelli, Maloney, nor Levine testified that they were in "fear of being killed" by the defendant, as the trial court indicates in its subparagraph (d).

the face and head; (f) use or attempted penetration with a foreign object was carried out against three of the four women, Miller was penetrated with a foreign object; and finally, (g) all the victims were in their mid 20s to early 30s, including Tina Miller.

Trial Court Opinion, 4/13/05, at 6–7.

The mere identification of similarities between the prior bad acts and the crime at issue, however, does not establish motive. Instead, as indicated above, there must be a firm basis for concluding that the crime currently on trial "grew out of or was in any way caused by the prior set of facts and circumstances." *Martin*, 479 Pa. at 68–69, 387 A.2d at 838. The trial court offers no explanation as to how Ross' prior incidents with Berardinelli, Maloney, and Levine provided him with a motive to kill Miller. The Commonwealth suggested that the prior assaults on Berardinelli, Maloney, and Levine demonstrated that women in Ross' presence risked being physically and/or sexually assaulted if they were unreceptive to his sexual advances. Trial Court Opinion, 4/13/05, at 4. The testimony at trial, however, does not support this hypothesis. The assault on Berardinelli was not a result of any lack of receptiveness on her part towards Ross, as she testified that Ross became physically abusive when she was *receptive to (i.e.,* derived pleasure from) his use of a foreign object during intimacy. While Maloney testified that she refused to have sex with Ross on the night in question, she also stated that he did not become physically

abusive until later—in the kitchen after he accused her of invading his privacy by looking into the bag he had brought home with him that night. Finally, although Levine testified that Ross was physically abusive on occasion during sex, she did not state (or imply) that said abuse was the result of any lack of receptiveness on her part to his sexual advances. As a result, the bad acts testimony does not establish any motive for Ross' alleged subsequent attack on Miller.

The trial court also found that the bad acts testimony of Berardinelli, Maloney, and Levine was admissible to prove Ross' intent to kill Miller. In its written opinion, the trial court appears to agree with the Commonwealth's contention that because Ross was charged with first-degree murder, which requires intentional conduct, that his state of mind was at issue. Trial Court Opinion, 4/13/05, at 4. We disagree that intent was at issue here. Intent is a mental state that can be inferred from conduct. *Commonwealth v. Martinez*, 301 Pa.Super. 121, 447 A.2d 272, 274 (1982). Given the circumstances surrounding Miller's murder, including the mutilation of the body, the use of duct tape, and the bite mark on her breast, there can be no question that this was an intentional killing. Ross' only defense was that he was not the perpetrator, and he did not raise any defense of accident, mistake, or lack of required intent. Accordingly, prior bad acts testimony should not have been permitted with regard to intent.[16]

16. For this reason, the trial court's reliance on *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835 (1989) is misplaced. In *Billa*, our Supreme Court found no abuse of discretion in permitting the testimony of a prior victim of the defendant, in part to rebut the defendant's claim that a subsequent murder by stabbing was accidental. Florence Morales ("Morales") testified that in November 1986,

the defendant raped her, stole her jewelry, and then told her that he would have to kill her so that she would not be able to go to the police. *Id.* at 174, 555 A.2d at 838. He then strangled Morales to unconsciousness, but she survived. *Id.* Morales was permitted to testify at the defendant's subsequent trial for the murder of Maria Rodriguez, whom the defendant stabbed and then stole her jewelry.

■ ■ ■ Next, the trial court found that the prior assaults on Berardinelli, Maloney, and Levine were admissible to prove the identity of Ross as Miller's killer. In *Commonwealth v. Shively*, 492 Pa. 411, 424 A.2d 1257 (1981), our Supreme Court held that evidence of prior crimes may be admissible

> to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here, *much more is demanded than the mere repeated commission of crimes of the same class,* such as repeated burglaries or thefts. *The device used must be so unusual and distinctive as to be like a signature.*

*Id.* at 415, 424 A.2d at 1259 (emphasis in original) (citing McCormick on Evidence § 190 (1972 2d ed.)); *see also Commonwealth v. Hughes*, 521 Pa. 423, 459, 555 A.2d 1264, 1282 (1989) (similar sexual attack on another young girl in the same neighborhood was admissible). "Required, therefore, 'is such a high correlation in the details of the crimes that proof that a person committed one of them makes it very unlikely that anyone else committed the others.'" *Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa.Super.) (quoting *Commonwealth v. Novasak*, 414 Pa.Super. 21, 606 A.2d 477, 484 n. 7 (1992)), *appeal denied*, 604 Pa. 696, 986 A.2d 150 (2009).

The trial court found these requirements to be satisfied in this case:

> According to the evidence proffered by the Commonwealth, [Ross] committed prior assaults on women that consisted of sexual assault, physical assault, sexual penetration/attempted penetration with

a foreign object, and the defendant was drinking at the time of most of these assaults. [Miller] was the victim of sexual assault, physical assault, sexual penetration with a foreign object and defendant was allegedly drinking the night of Miller's death.

> This court finds the similarities between the prior bad acts of [Ross] and the killing of [Miller] are of significant and substantial detail to allow the Commonwealth to present testimony of defendant's prior bad acts to attempt to prove the identity of who committed the death of Miller.

Trial Court Opinion, 4/13/05, at 10–11.

In our view, while the trial court has identified some similarities between the prior bad acts testimony and Miller's murder, these similarities are far from satisfying the *Shively* standard of being so "unusual and distinctive as to be like a signature." To the contrary, the testimony of Berardinelli, Maloney, and Levine establishes, at most, the commission of crimes or conduct "of the same general class," namely physical and/or sexual assaults, accompanied by the use of foreign objects. In this regard, their testimony does not evidence any particular distinctive pattern of behavior by Ross. His abusive behavior appears to be triggered in each incident by different causes; he used a different foreign object with Berardinelli than with Maloney and Levine; the Maloney incident, unlike the other two, did not involve penetration (or attempted penetration) with the foreign object; and nothing in the testimony of Berardinelli or Maloney parallels Levine's description

---

*Id.* at 173–74, 555 A.2d at 837. The defendant claimed that he stabbed her accidentally during a struggle for the knife. *Id.* at 175, 555 A.2d at 839. Our Supreme Court affirmed the trial court's decision to permit Morales' testimony both because "both

crimes possessed similar characteristics and *modus operandi*" and because the evidence was of important evidentiary value "to establish motive/intent and to negate appellant's claim of accident." *Id.* at 178, 555 A.2d at 840.

of being forced to engage in oral and anal sex.

More importantly, the trial court failed to consider the important differences between the prior bad acts testimony and Miller's murder. Significantly, entirely disregarded by the trial court was the fact that the attack on Miller involved a level of **brutality** far in excess of the incidents of physical and/or sexual abuse described by Berardinelli, Maloney, and Levine. As the testimony of Dr. Funke established, Miller's body had been severely mutilated, with such massive force utilized that the muscle wall between the sphincter and the vagina had been torn open. Ross' violent behavior with his former paramours, while totally unacceptable, pales in comparison to the brutality of the attack on Miller. Moreover, Miller had a bite mark on her breast, her hands had been securely duct-taped behind her back (with more duct tape covering her head, mouth, and arms), and she had apparently been held under water. In contrast, nothing in the testimony of Berardinelli, Maloney, or Levine provides any parallel whatsoever to these obvious dissimilarities.

Finally, Berardinelli, Maloney, and Levine were all romantic partners of Ross in on-going relationships with him. Berardinelli was his girlfriend; Maloney was his wife, and Levine was his fiancée. At the time of the incidents of abuse, all three women were cohabitating with Ross and had been for several months. As such, their testimony essentially established that Ross had engaged in a pattern of *domestic abuse* with his romantic partners.

Miller's murder, in significant contrast, did not involve domestic abuse. No testimony at trial established that Miller and Ross had an ongoing relationship as of June 27, 2004, or had even met each other before that evening. According to the Commonwealth (through the testimony of the Coroner and Dr. Funke), Miller was killed at or near the location where her body was found (outdoors, near the boat dock on Canoe Creek Lake). The abuse described by Berardinelli, Maloney, and Levine all occurred indoors, in the homes they shared with Ross.

Accordingly, the testimony of Berardinelli, Maloney, and Levine did not establish any particular *modus operandi* or other pattern of conduct on Ross' part so unusual and distinct as to constitute a "signature" identifying him as Miller's killer. To the contrary, the testimony of Berardinelli, Maloney, and Levine demonstrated that Ross had engaged in a pattern of domestic abuse with romantic partners. Because Miller was not in a domestic relationship with Ross and because of the other noted pertinent dissimilarities in the attack on Miller, the prior bad acts testimony detailing instances of domestic violence should not have been admitted to prove identity.

■ Fourth, the trial court found that the prior bad acts testimony was admissible to prove a "common scheme, plan or design." Under Pennsylvania law, evidence of prior bad acts is admissible to prove "a common scheme, plan or design where the crimes are so related that proof of one tends to prove the others." *Commonwealth v. Elliott*, 549 Pa. 132, 145, 700 A.2d 1243, 1249 (1997). In *Elliott*, for example, the appellant was accused of sexually assaulting and then killing a young woman he approached outside a particular club (Purgatory) at 4:30 a.m. Our Supreme Court affirmed a trial court's decision to permit three other young women to testify that the appellant had similarly preyed upon each of them as they were leaving the Purgatory club in the early morning hours, and that he had then physically and/or sexually assaulted them. *Id.* at 146, 700 A.2d at 1250–51. Our Supreme

Court concluded that the "close similarity between these assaults" was admissible to establish a common scheme, plan or design. *Id.*

For the same reasons as set forth above in connection with the identity exception, however, the prior bad acts testimony proffered by the Commonwealth should not have been admitted to show a common scheme, plan or design. The testimony of Berardinelli,[17] Maloney, and Levine did not establish a pattern of conduct on Ross' part so distinctive that "proof of one tends to prove the others." *Id.* at 145, 700 A.2d at 1249. Instead, the prior bad acts testimony demonstrated that Ross was a domestic abuser of women with whom he was involved in on-going romantic relationships, and did not show a unique "signature" *modus operandi* relevant to Miller's murder. Indeed, the profound dissimilarity in the level of brutality inflicted on Miller, along with the bite on her breast and the extensive use of duct tape to bind her, have no parallel to the incidents of domestic abuse described by Berardinelli, Maloney, and Levine, and weigh strongly against any inference that proof of his domestic abuse tended to prove he murdered Miller.[18]

The purpose of Rule 404(b)(1) is to prohibit the admission of evidence of prior bad acts to prove "the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). While Rule 404(b)(1) gives way to recognized exceptions, the exceptions cannot be stretched in ways that effectively eradicate the rule. With a modicum of effort, in most cases it is possible to note some similarities between the accused's prior bad conduct and that alleged in a current case. To preserve the purpose of Rule 404(b)(1), more must be required to establish an exception to the rule—namely a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question. No such close factual nexus exists in this case, and this Court has warned that prior bad acts may not be admitted for the purpose of inviting the jury to conclude that the defendant is a person "of unsavory character" and thus

---

17. The assault on Berardinelli, which occurred more than eight years prior to Miller's murder, was too remote in time to be admissible under the common scheme, plan or design exception. In *Commonwealth v. Aikens*, 990 A.2d 1181 (Pa.Super.), *appeal denied*, 607 Pa. 694, 4 A.3d 157 (2010), we held that "while remoteness in time is a factor to be considered in determining the probative value of other crimes evidence under the theory of common scheme, plan or design, *the importance of the time period is inversely proportional to the similarity of the crimes in question.*" *Id.* at 1185 (emphasis added) (quoting *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1319 (1995), *abrogated on other grounds as recognized in Commonwealth v. Hanible*, 575 Pa. 255, 261 n. 6, 836 A.2d 36, 40 n. 6 (2003)).

While prior bad acts evidence has been permitted in a few cases despite a significant lapse in time, in those cases the court determined that there were strong similarities between the prior conduct and the crimes at issue. *See, e.g., Miller*, 541 Pa. at 549, 664 A.2d at 1319 ("Given the striking similarity of the three incidents, the fact that the three attacks occurred over a five year period is not remote enough to render the evidence of the attack on Johnson inadmissible."); *but see Shively*, 492 Pa. at 416, 424 A.2d at 1259 ("Even if the time span instantly is only seven months, we fail to perceive enough similarity between the two episodes to allow admission of the prior activity."). Given the lack of similarity between Berardinelli's recollections of domestic physical abuse by Ross and the details of Miller's murder (as chronicled hereinabove), Berardinelli's testimony should have been excluded on remoteness grounds.

18. Because the Commonwealth has not established a Rule 404(b)(2) exception, we do not proceed to Rule 404(b)(3) to weigh the probative value of the evidence versus its potential for prejudice. Pa.R.E. 404(b)(2), (3).

inclined to have committed the crimes with which he/she is charged. *See, e.g., Commonwealth v. Kjersgaard,* 276 Pa.Super. 368, 419 A.2d 502, 505 (1980). Based upon our review of the record, we must conclude that the testimony of Berardinelli, Maloney, and Levine was used to establish that Ross was an abusive man who in the past was physically and sexually abusive to his romantic partners so that the improper inference could be drawn that he was capable of, and had the propensity for, committing the types of grotesque acts of physical and sexual abuse inflicted upon Miller resulting in her death.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

ALLEN, J. files a Dissenting Opinion in which STEVENS, P.J., BENDER and PANELLA, JJ. join.

DISSENTING OPINION BY ALLEN, J.:

I respectfully dissent from the Majority's determination that Appellant, Paul Aaron Ross ("Ross"), is entitled to a new trial, and that evidence of his prior bad acts was inadmissible under Pa.R.Evid. 404(b). *See* Majority Opinion at 87. The Majority concluded "that the trial court manifestly abused its discretion in refusing to grant Ross a continuance to permit his newly retained private counsel the opportunity to prepare for trial." *Id.* The Majority also opined that the trial court "abused its discretion in allowing the Commonwealth to introduce the testimony of three of Ross' former romantic partners regarding instances of domestic abuse." *Id.* at 87. I disagree.

Granting a motion for continuance is within the sound discretion of the trial court. *See Commonwealth v. Randolph,* 582 Pa. 576, 873 A.2d 1277, 1281 (2005) (discretion is abused when the law is mis-

applied, or the trial court's judgment is manifestly unreasonable, partial, prejudiced, biased, or arising from ill-will towards the defendant as reflected in the evidence or record). My review of the record found no such abuse of discretion by the trial court.

My careful review of the certified record reveals: 1) that Ross received consistent and appropriate legal representation; 2) that Ross' experts were able to assist Ross' counsel in preparing a defense; 3) that Ross' requests for additional preparation time were properly considered and honored by the trial court; 4) that Ross suffered no prejudice warranting a new trial; and 5) that the evidence of prior bad acts was admissible.

Assistant Blair County Public Defender Theodore Krol, Esquire, initially handled Ross' defense. The Majority contends that there is no record evidence supporting the Commonwealth's assertion that Attorney Krol was "an associate partner of Attorney Dickey." *See* Majority Opinion at 92, referencing Appellee's Substituted Brief on Reargument, at 4 n. 1. However, the certified record shows that one of Attorney Krol's first legal pleadings on Ross' behalf was a Request for Bill of Particulars filed on Attorney Dickey's letterhead, and noting that Attorney Krol was Attorney Dickey's "Associate." Request for Bill of Particulars, 12/2/04, at 1.

The professional relationship between Attorney Krol and Attorney Dickey is further evidenced in a July 12, 2005 Order issued by the trial court, directing the Commonwealth to answer Attorney Krol's "informal request for discovery" issued on June 28, 2005 on Attorney Dickey's letterhead. Trial Court Order, 7/12/05, at 1; *see also* Exhibit A, at 1. Significantly, Attorney Krol's June 28, 2005 letter states, "I have listed some items **we** would like cop-

ies of ...", possibly implying that he was working with Attorney Dickey at this stage. *Id.* (emphasis added). This implication is supported by the fact that the letter is signed "Yours truly, Law Offices of Thomas M. Dickey", directly above Attorney Krol's name. *Id.*

The December 2, 2004 Request for Bill of Particulars and the June 28, 2005 letter requesting discovery, both on Attorney Dickey's letterhead, readily substantiates the relationship between Attorneys Krol and Dickey, and supports the conclusion that Attorney Dickey was involved in Ross' defense well in advance of Attorney Dickey's formal entry of appearance in this matter.

Additionally, the trial court assigned Phillip O. Robertson, Esquire to be Ross' death penalty counsel in an Order entered on March 30, 2005. *See* Trial Court Order, 3/30/05, at 1. Attorney Robertson remained Ross' death penalty counsel throughout the entire case, further reflecting the continuity and consistency within Ross' legal defense team. *Id.; see also* Phillip O. Robertson's Bills for Services Rendered.

Ross' request for new counsel was set forth in a *pro se* pleading Ross filed on July 19, 2005. *See* Ross' Innefective [sic] Counsel motion, 7/19/05, at 1. In his motion, Ross asserted his attorney "never sat 1 on 1 with [Ross] in 10 months' time, to discuss [Ross'] version of events." *Id.* at 1. Following an August 18, 2005 hearing, the trial court entered an Order on August 23, 2005 dismissing Ross' motion. Trial Court Order, 8/23/05, at 1.

On August 22, 2005, Ross re-filed his original *pro se* motion for ineffective assistance of counsel. Attorney Krol answered Ross' August 22, 2005 motion on Septem-

ber 1, 2005, and staunchly defended his representation of Ross.

Specifically, Attorney Krol asserted:

[Ross] requested a motion to be filed to dismiss the charges due to insufficient evidence at the preliminary hearing. Counsel indicated this would be frivolous due to the prima facie standard. [Ross] requested statements be suppressed which were given to Cpl. Smith. This motion was filed.

[Ross] was informed motions would be filed for experts to be appointed and the motions were filed. Counsel consulted with [Ross] regarding filing a motion to suppress statements, received reports from Mr. Yuengling [beer company president regarding beers found at crime scene], a motion to view Fee's residence, and to compel expert inventory. This motion was filed the day of the last pre-trial conference and a copy provided to [Ross].

Counsel met with [Ross] prior to the preliminary conference to discuss the facts of the case and receive his version of events. After the preliminary hearing counsel met with client, investigators, Attorney Robertson [death penalty counsel] and counsel's paralegal Ann Shey[1] to discuss his version of events. Counsel, Don Speice [Chief Public Defender] met with [Ross] at the 2nd pre-trial conference and Counsel met [Ross] on July 20th and at the conclusion of the last pre-trial conference in August. [Ross's] version of events had been fully explained to counsel and counsel has been updated with information from the investigators periodically after the investigators met with [Ross] numerous times over the last several months.

---

1. [Paralegal Ann Shey appears to be referenced via initials on Attorney Krol's November 30, 2004 Request for Bill of Particulars, which were filed on December 2, 2004, and which Attorney Krol issued from Attorney Dickey's office.]

Counsel at each meeting with [Ross] discussed aspects of the defense with [Ross].

It is admitted that counsel for [Ross] has a full case load between the Public Defender's Office and private practice, however, [Ross'] case is worked on routinely with counsel being fully aware of the facts of the prosecutor's case and [Ross'] version of the case.

Counsel has been informed that the police are talking to witnesses in a manner which may be perceived as intimidating and coercive, as well as, possibly looking through his mail. Counsel is not aware of any inculpatory evidence that is being obtained illegally which may be used at trial.

Counsel is not aware of mail being read by the police and is not aware of any evidence that may have been obtained through the mail that is inculpatory towards [Ross].

Counsel has raised the issue before the Court regarding the "bad act" witnesses and that the defense objected and continues to object to their accuracy as well as their relevance. The matter is one of credibility for the trier of fact.

Counsel for [Ross] believes he competently argued and followed up with a memorandum of law outlining why the "bad acts" testimony should be precluded.

Discrepancies in reports are a credibility issue to be presented at trial which is not a valid pre-trial issue.

Attorney Krol's Answer to [Ross'] Ineffective Counsel Claim, 9/1/2005, at 1–3.

The trial court entered an Order denying without prejudice Ross' second *pro se* petition for ineffective counsel on Septem-

ber 20, 2005. *See* Trial Court Order, 9/20/05, at 1. Importantly, Attorney Krol's answer refutes Ross' claims of ineffectiveness, and contradicts Ross' repeated efforts to cast aspersions upon the work performed by Attorney Krol on Ross' behalf.

Attorney Dickey formally filed his entry of appearance on Ross' behalf on October 6, 2005. *See* Attorney Dickey's Praecipe for Entry of Appearance, 10/6/05, at 1. On October 17, 2005, Attorney Dickey filed his first supplemental omnibus pre-trial motions in this case.

Attorney Dickey averred:

[T]his Honorable Court has heretofore granted [Ross] relief in the form of the appointment of various experts; to wit: Dr. Levine (Odonotology); Dr. Shaler (DNA)[2]; Dr. Vey (forensic pathology). Additionally, this Honorable Court has appointed Jim Ellis (Investigator) as well as Phillip Robertson, Esquire to assist in the investigation and presentment of death penalty phase, respectively.

Ross' Supplemental Omnibus Pre–Trial Motions, 10/17/05, at 1.

Attorney Dickey explained:

The financial circumstances of [Ross] have not changed save for the fact that [Ross'] father and family relatives have compiled monies to **hire private qualified death penalty counsel. Said counsel, this scrivener, has agreed to represent [Ross]** for a substantially and vastly reduced fee in light of the present posture of the case.

*Id.* at 2 (emphasis added).

Therefore, Attorney Dickey requested:

**2.** [Dr. Shaler never testified on Ross' behalf because the Commonwealth never presented **DNA** evidence.]

Based on the foregoing, judicial economy[,] as well as precedents set forth in previous death penalty cases both in Blair, Cambria[,] and other neighboring counties (wherein experts were appointed notwithstanding the hiring of private counsel)[,] it is submitted that it is in the best interest of justice that this Honorable Court continue to appoint all experts, investigators, as well as Phillip Robertson, Esquire, in this case.

*Id.*

The foregoing shows unequivocally that Attorney Dickey was not dissatisfied with the expert choices which had been made by Attorney Krol, and that Attorney Dickey was not seeking to replace the expert services that had already been provided and performed by the defense team.

The October 17, 2005 pleading also requested an order:

[G]ranting a continuance in order for [Ross] to rebut the Commonwealth's findings and opinions; and/or exclude the foregoing expert and/or other opinion evidence; **and/or appoint additional experts; and/or any and all relief deemed appropriate.**

*Id.* at 5 (emphasis added).

The requests for relief, which were pled in the alternative, clearly subsumed and acknowledged the trial court's discretion to select "any and all relief deemed appropri-

ate." Ross' Supplemental Pre–Trial Omnibus Motions, 10/17/05, at 5.

Before the trial court ruled on the October 17, 2005 pleading, Attorney Dickey filed additional omnibus pre-trial motions on October 21, 2005, requesting the appointment of forensic scientist Larry Dehus with a cap for his services of $6,000. *See* Ross' Supplemental Omnibus Pre–Trial Motions, 10/21/05, at 2.

The October 21, 2005 motion indicated Ross' experts "would need at least a week to analyze, review and [inspect] all evidence in order for [Ross] to be ready for trial." *Id.* at 5. The motion stated "[w]hile a continuance of one term is requested, [Ross] would request that at a minimum of no less than **one week** continuance be granted between the time of completion of jury selection and the beginning of trial." *Id.* (emphasis added).

On October 24, 2005, the trial court appointed forensic scientist Larry Dehus ("Dehus") as an additional defense expert, in response to the October 17, 2005 and October 21, 2005, pre-trial omnibus motions.[3] *See* Trial Court Order, 10/24/05, at 6. In appointing Dehus, the trial court set a cap of $7,000 for his services—$1,000 more than requested. *Id.* at 6.

Attorney Dickey filed a final set of omnibus pre-trial motions on Friday, October 28, 2005, stating:

---

3. It is questionable whether Attorney Dickey signed the October 21, 2005 and October 28, 2005 requests for continuances. His signatures in an August 29, 2006 sworn affidavit submitted by him, and in his witnessed Client Agreement regarding his appellate services in this case, appear **drastically** different from the "signature" appearing on the October 21, 2005 and October 28, 2005 pleadings. By contrast, the handwriting of Attorney Dickey's notary on the above referenced affidavit is strikingly similar to the handwriting style of the "signatures" on the October 21, 2005 and

October 28, 2005 pleadings. Therefore, those pleadings may not have been properly before the trial court. *See* Pa.R.Crim.P. 575(a) (requiring motions to be signed "by the person or attorney making the motion"); *see also* Pa.R.Crim.P. 575(g) (pleadings referencing matters outside of the record require verification by a "sworn affidavit" or by "the unsworn written statement . . . that the facts are verified subject to the penalties for unsworn falsification to authorities under the Crime Code § 4904, 18 Pa.C.S. § 4904").

[T]he defense has not been able to receive findings from its experts ...

\* \* \*

Over fifty witnesses have been interviewed by members of the Pennsylvania State Police and this scrivener has not had ample time to meet with investigators, locate and/or interview potential witnesses.

The Commonwealth has forwarded to [Ross] lists of additional witnesses as well as additional medical, scientific and/or expert reports; including but not limited to shoe test results[,] "non DNA non scientific evidence" at the eve of jury selection and/or during jury selection. [Ross] has not had a full opportunity to review, analyze, interpret said results and not enough time to interview witnesses, do criminal background checks, etc.

A similar situation currently exists relative to the [Ross'] DNA expert, Dr. Shaler; [Ross'] Odontologist, Dr. Levine[,] as well as Pathologist, Dr. Vey.

\* \* \*

As a result of the foregoing, [Ross] requests a continuance of one trial term; and/or in the alternative a continuance for one full week from the date of filing said motion; **and/or in the alternative a continuance until Monday, October 31, 2005."**

Ross' Supplemental Omnibus Pre–Trial Motions, 10/28/05, at 1–2 (emphasis added).

Importantly, notwithstanding the litany of purported outstanding defense tasks set forth in the October 21, 2005 and the October 28, 2005 continuance requests, the fact that the motions requested a seven-day and a three-day continuance, respectively, undermines the contention that Attorney Dickey required a significant amount of time to finalize the preparation of Ross' defense.

Further, the October 21, 2005 and October 28, 2005 motions disregard that in an August 23, 2005 Order, the trial court advised that "[j]ury selection is scheduled for this matter for Monday, October 17, 2005, with trial to follow upon the selection of the jury." Trial Court Order, 8/25/05, at 3. However, the trial court subsequently postponed jury selection until October 21, 2005, and after its conclusion on October 25, 2005, the trial court noted "we obviously are not going to start the trial tomorrow ..." N.T., 10/25/05, at 79. Indeed, the trial did not commence until Friday, October 28, 2005. N.T., 10/28/05, at 214.

The certified record shows that the trial court not only honored Ross' request for an additional expert with a generous budget, but also considered Ross' need for time in delaying jury selection, and honored it yet again in delaying the start of the trial following jury selection.

Significantly, the trial court detailed its reasoning for denying a longer continuance as follows:

[Ross'] trial counsel entered his appearance October 6, 2005, mere weeks before jury selection commenced. Defense counsel told this Court, upon entering his appearance, he was confident that he would be ready to go to trial, on schedule. As jury selection approached, he asked for multiple continuances for a multitude of reasons. He neither stated then nor does he state now specifically how he would have prepared differently had he been given more time.

After private defense counsel entered the case, the Commonwealth, court and defense counsel worked together to accommodate [Ross'] requests to assure defense counsel's preparedness. For example[:] the Commonwealth gave defense counsel reports and other documents that were misplaced during the

transfer of attorneys; we ordered the Pennsylvania State Police to produce the crime scene log, mapping review and "bruise progression" photographs; we also appointed Larry M. Dehus, a forensic scientist, as an expert for the defense, October 24, 2005; furthermore we order the Pennsylvania State Police to physically transport evidence to Mr. Dehus by October 24, 2005; moreover, after jury selection we delayed the evidentiary phase of trial by a day and a half to allow Defense counsel adequate time for trial preparation.

Defense counsel worked diligently for [Ross]. He told this Court he worked over lunches, weekends and even into the evenings calling experts, investigators and interviewing witnesses. Perhaps the best evidence of defense counsel's preparedness exists in the transcript of trial where he asks intelligent, informed questions in lengthy direct and cross-examinations of each and every witness.

This Court found no basis to grant the continuances at the time [Ross] requested them and even less reason in hindsight. In this Court's eighteen years on the bench we have seen few attorneys who could have taken a capital murder case a few weeks before trial, with the complexity of this case, and have represented [Ross] as diligently and with such informed zealousness as this defense counsel. The record speaks for itself. Trial Court Opinion and Order, 2/2/06, at 4–5.

The Majority was not persuaded by the trial court's rationale, and found Ross to be unduly prejudiced. The Majority contends:

Attorney Dickey had to give his opening statement to the jury without knowing the opinions of his expert witnesses, some of whom had been retained within days of the start of trial, and all of whom were still reviewing physical evidence and/or expert reports just received from the Commonwealth.

Majority Opinion at 91.

This finding of prejudice and insufficient time for Attorney Dickey to meet with defense experts in order to learn of their findings and to prepare for trial, are belied by the experts' billing records which show that their work was completed in time to assist in Ross' defense.

In an Order entered December 14, 2005, the trial court ordered Dehus to be paid in full for his services. Trial Court Order, 12/14/05, at 1. Dehus' billing records were appended to the order, and reflect that Dehus had a teleconference with Attorney Dickey on October 20, 2005, and that Dehus met on October 24, 2005 for an hour with "Pa Trooper to receive evidence." *Id.*, Exhibit A, at 1. More importantly, Dehus spent 2.5 hours on October 26, 2005 examining shoe print evidence. *Id.* Dehus then spent 8.5 hours on October 27, 2005, 8 hours on October 28, 2005, and 5 hours on October 31, 2005 researching and analyzing evidence. *Id.*

There is no additional billing showing Dehus ever resumed any substantive expert work in this matter, thus supporting the reasonable conclusion that Dehus completed his research and analysis no later than October 31, 2005. The October 31, 2005 completion date is buttressed by the trial court's October 24, 2005 Order appointing Dehus and requiring him to complete his work by October 31, 2005 in order to receive payment. *See* Trial Court Order, 10/24/05, at 6. Moreover, based on his billing records, Dehus' substantive preparation for this case concluded in advance of his November 8, 2005 testimony.

Likewise, in a separate Order entered December 14, 2005, the trial court ordered

Dr. Vey, Ross' forensic pathologist, to be paid for his services in this matter. *See* Trial Court Order, 12/14/05, at 1. The trial court appended Dr. Vey's invoice to the Order. Dr. Vey's invoice **only noted 3 hours of "case specific research and trial preparation" for the period of October 13, 2005 until November 9, 2005.** Dr. Vey makes no other reference to any other work done on this case prior to his travel and November 9, 2005 testimony. *Id.*, Exhibit A, at 1. This documentation supports the reasonable conclusion that Dr. Vey's work in this case was not as complex and time-consuming as Attorney Dickey purported, and that Dr. Vey's work was concluded in time to assist Attorney Dickey in Ross' defense.

On December 14, 2005, the trial court also ordered a payment to be issued to Dr. Levine, Ross' dental expert. Trial Court Order, 12/14/05, at 1. Dr. Levine's invoice, which was attached to the order, notes he only conducted **8 hours of "examinations, analysis, digital clarifications, [and] multiple telephone consultations"** from June to November 2005, without any exact dates listed for this period. *Id.*, Exhibit A, at 1. Dr. Levine's next billing date is November 9, 2005, the day of his testimony, for which he charged 19.5 hours for his travel time and trial testimony. *Id.* The latter is more than double the time he claimed preparing for trial.

Dr. Levine's invoice does not give credence to Attorney Dickey's contention that Dr. Levine's findings were not completed in time to assist in Ross' defense. It strains credulity that an expert who was appointed months before trial, and who only expended 8 hours in his preparation, was unable to assist Ross' counsel in preparing Ross' defense in this matter, and to aid in Attorney Dickey's cross examination of Dr. Asen, the Commonwealth's forensic odontologist.

In fact, Dr. Asen testified he sent the materials he relied on in arriving at his findings, along with his findings, to Dr. Levine. N.T., 11/02/05, at 104. Dr. Levine confirmed that he received the foregoing materials, including dental models, photographs, overlays, and CDs, along with Dr. Asen's preliminary hearing testimony from Attorney Krol. N.T., 11/9/05, at 258. Dr. Levine's receipt of the same, and Attorney Dickey's ability to learn of Dr. Levine's expert findings, is further confirmed by Attorney Dickey's statement at trial, claiming "My expert, who by the way is board certified, will say that [Dr. Asen's] opinion [is] absolutely untrue." N.T., 11/2/05, at 7.

The Majority recognizes:

A bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion. *Commonwealth v. Ah Thank Lee* [389 Pa.Super. 201], 566 A.2d 1205, 1206 (Pa.Super.1989), *appeal denied*, 527 Pa. 615, 590 A.2d 756 (1990). Instead,

[a]n appellant must be able to show specifically in what manner he would be unable to prepare his defense or how he would have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice. *Commonwealth v. Brown* [351 Pa.Super. 119], 505 A.2d 295, 298 (Pa.Super.1986).

Majority Opinion at 89–90.

The Majority further posits:

Attorney Dickey's inability to conduct further investigation into possible defenses was also prejudicial to Ross ... Moreover, Attorney Dickey had no ability to investigate and/or prepare defenses potentially available to Ross. For example, Ross advised the police that [the

victim] had been picked up by a bearded male in a white pickup truck, and some evidence suggested that there were unidentified tire tracks and shoe prints near the scene of the murder. *See e.g., N.T.,* 10/31/05, at 346. Given the lack of time, however, counsel had no opportunity to attempt to develop these defenses.

Majority Opinion at 91.

My review of the record leads to a different conclusion. The record shows that in the time the trial court afforded Attorney Dickey, he was able to present various defense theories in an attempt to create reasonable doubt relative to Ross' guilt. Specifically, Attorney Dickey was able to establish at trial that the time of death was not necessarily 5:00 a.m., but rather could extend as late as 30 minutes before the victim was found at approximately 12:20 p.m., thus providing Ross with an alibi through his father, with whom he spent the morning. N.T., 10/28/05, at 81–82; 11/09/05, at 24–32.

Attorney Dickey also produced at trial a witness, Mr. Christopher Leonard, who testified that he saw a tall white male with a thin beard and mustache the morning the victim's body was discovered at Canoe Creek. N.T., 11/9/05, at 180–186. Mr. Leonard also saw a white pick-up truck at Canoe Creek that same day, thereby bolstering Ross' claim that a white male fitting that description and using that same type of vehicle was in the area of the crime, and had the opportunity to be the perpetrator of Miller's murder. *Id.*

Lastly, Attorney Dickey elicited extensive testimony about an unsolved but similar rape and murder committed in a nearby county, in which duct tape was used and an unconfirmed bite mark appeared on the victim's breast. N.T., 11/9/05, at 153–158. This unsolved case involved a suspect that was acquainted with the victim in Ross' case, thus presenting the possibility that an unapprehended local serial rapist, and not Ross, was guilty of murdering the victim. *Id.*

In sum, I disagree with the Majority's conclusion that Attorney Dickey did not have sufficient time to prepare for trial, and that Ross was prejudiced by the trial court's denial of a lengthier continuance. My review of the record supports the trial court's determination that Ross had an experienced and prepared defense team, and that Ross was not prejudiced by the trial court's denial of a longer continuance. *See Randolph,* 873 A.2d at 1281; *see also Brown,* 505 A.2d at 298; *Commonwealth v. Boxley,* 596 Pa. 620, 948 A.2d 742 (2008).

In a second issue, the Majority determined the trial court abused its discretion in admitting evidence of Ross' prior bad acts concerning Elizabeth Berardinelli ("Berardinelli"), Laura Maloney ("Maloney"), and Deborah Levine ("Levine"). *See* Majority Opinion at 87–88.

A trial court's determination to admit evidence may not be reversed in the absence of an abuse of discretion by the trial court. *See Commonwealth v. Minerd,* 562 Pa. 46, 753 A.2d 225, 229 (2000). Here, I would find that the trial court's admission of Ross' prior bad act evidence was admissible to show motive, intent, identity, *modus operandi* and "signature". *See Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 496 (2004); *see also Commonwealth v. Elliott,* 549 Pa. 132, 700 A.2d 1243 (1997); *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989); *Commonwealth v. Donahue,* 519 Pa. 532, 549 A.2d 121, 126 (1988); *Commonwealth v. O'Brien,* 836 A.2d 966, 969 (Pa.Super.2003); *Commonwealth v. Luktisch,* 451 Pa.Super. 500, 680 A.2d 877 (1996).

Unlike the Majority, I am not persuaded that Ross' prior bad acts should be charac-

terized primarily as domestic disputes without probative relevance to the circumstances of the victim's murder. *See* Majority Opinion at 98–99. Rather, I agree with the trial court that Ross' attacks on Berardinelli, Maloney, and Levine reviewed *in toto*, show a significant pattern of sexual abuse of women, coupled with the escalated use of force and violence throughout the years, and a predilection for using foreign objects during sexual intercourse.

Moreover, the Majority disregards the trial court's preclusion of testimony by **three** additional women. The trial court disallowed the testimony of these three women after reviewing the Commonwealth's offer of proof, and balancing the relative probative value of the evidence *in toto* versus the prejudicial effect it could have on Ross. The trial court's careful consideration of the evidence and limitation of what was ultimately deemed admissible, militates in favor of my determination that the prior bad act evidence was properly admitted by the trial court.

On December 8, 2004, the Commonwealth filed a motion to admit prior bad acts evidence pertaining to *inter alia* "physical assaults and threats against Wendy Sue Bott ("Bott"), Laura Maloney ("Maloney"), [and] Deborah Levine ("Levine")." Commonwealth's Motion for Admission of Bad Acts Evidence, 12/8/04, at 1.

In Exhibit A of its motion, the Commonwealth proffered evidence that Levine, Ross' live-in-girlfriend, was assaulted by Ross five times throughout their relationship. *See Id.,* Exhibit A, at 1. The first assault occurred after Ross became jealous of Levine's interaction with one of Ross' co-workers at a local pizza shop. *Id.* Ross' violence towards Levine escalated over time and was "typical after Ross had been drinking." *Id.* The Commonwealth noted

that after initially having a normal sex life, Ross eventually "would beat [Levine] when he wanted sex", and that Ross "wanted to use sex toys", with the sex becoming "exceptionally more rough and that to get [Ross] away from her, she had to physically assault him". *Id.,* Exhibit A at 2. Further, when "Ross was engaged in sexual intercourse, he would repeatedly punch Levine in the face and that Ross tied [Levine] to the bed." *Id.*

In Exhibit C, the Commonwealth stated Maloney would testify that Ross assaulted her when she was pregnant by "pushing, choking, throwing her and punching her in the face and head multiple times", and that Ross plead guilty to Simple Assault in connection to this incident and served 3 months in jail. *Id.,* Exhibit C, at 1.

As to Bott, the Commonwealth expected her to testify that on Christmas Eve of 2002, Ross broke into her home, "jumped on top of her and attempted to put something over her mouth" as she laid in bed. *Id.,* Exhibit D, at 1. Ross instructed her "to roll onto her stomach at which point she rolled over out of her bed and was able to escape", believing that "due to the nature of the attack, she was fighting for her life." *Id.* Bott was Ross' neighbor at the time. Ross "entered a nollo [sic] contendere plea in the case and received a period of 5 years' probation." *Id.*

With regard to Berardinelli, she testified that she lived with Ross from 1995 to 1996. N.T., 10/29/05, at 6–7. She testified that Ross during an act of consensual sex inserted a hair spray bottle into her vagina. *Id.* at 12. Ross subsequently pulled her hair, punched her and threw her against the wall. *Id.*

On July 11, 2005, the Commonwealth filed an additional motion for admission of bad acts evidence pertaining to "uncharged criminal conduct" by Ross against his for-

mer paramour Stacy Ann Stewart ("Stewart"). Commonwealth's Motion for Admission of Bad Acts Evidence, 7/11/05, at 1. Attached to the motion was Stewart's written interview with Trooper Aiello in which she noted she dated Ross from about February/March 1992 until a year later.

She stated:

[Ross] is pure evil. When I think of how the devil would look, I imagine that he would look like [Ross]. In the year we lived together, [Ross] beat me and raped me many, many times. He beat me almost weekly, so that would be about 50 times. And I mean serious beatings, with bad bruises and swollen eyes. He raped me 25 to 30 times. I was so afraid of him.

*Id.,* Exhibit A, at 1.

Although Stewart denied Ross ever tying her up, she admitted that Ross "beat her during sexual intercourse" and expressed, "[a]ll of it was rough sex, but he did beat my face during intercourse sometimes." *Id.* Stewart further indicated that Ross "often used foreign objects. He loved putting uncommon objects into me. Things like popsicles, lollipops, silverware and cooking utensils (like spatulas and egg turners)." *Id.* She confirmed that Ross became "very violent when he was high or drinking." *Id.,* Exhibit A, at 2.

Additionally, on August 2, 2005, the Commonwealth filed another motion seeking the admission of bad acts evidence against Ross regarding his prior girlfriend Heather Lynn Crynock ("Crynock"). *See* Commonwealth's Motion for Admission of Bad Acts Evidence, 8/2/05, at 1. As part of the motion, the Commonwealth appended a police report detailing Crynock's statement to Trooper Aiello on July 20, 2005. *Id.* at Exhibit A. Crynock stated that Ross repeatedly "groped" her breasts and tried to "put his hands down the front of [her] pants" while she was highly intoxicated at

Ross' father's home on New Year's Eve in 1999. *Id.,* Exhibit A, at 1. She stated that as the evening progressed "he was more aggressive than before, squeezing my boobs really hard. I pushed his hands away and told him—again—to knock it off, that what he had in mind was absolutely not going to happen." *Id.,* Exhibit A, at 2. She ended her interview by stating "I was afraid for my safety and thought that he was going to rape me." *Id.,* Exhibit A, at 2.

The trial court ruled that only the prior bad act evidence relative to Berardinelli, Maloney, and Levine would be more probative than prejudicial and therefore admissible under Pa.R.C.P. 404. Trial Court Opinion and Order, 4/13/05, at 16.

The trial court determined:

This Court finds the prior bad acts evidence is more probative than prejudicial in three (3) ... instances, Berardinelli, Maloney, and Levine because: **(a)** of the similarities between the crimes; **(b)** there was a relatively short time lapse between all of the prior bad acts, with the oldest one being in 1996 and the most recent bad act initiated three (3) months before Tina Miller's death; **(c)** there are no witnesses to Miller's death; **(d)** the women all knew [Ross] and could identify him as the person who committed the bad acts against them **(e)** this Court can give limiting instructions regarding the use of the prior bad act evidence; and **(f)** the women will be subject to cross-examination in which the jury will be able to decide themselves how much credibility to assess each women's story.

*Id.* at 16–17 (emphasis in original).

The trial court also ruled:

Bott's testimony must be precluded regarding her assault, which was allegedly carried out by [Ross], because she can-

not identify who assaulted her in her dark bedroom. Therefore, Bott's testimony would be more prejudicial than probative under the circumstances to [Ross].

*Id.* at 17.

On September 20, 2005, the trial court similarly precluded the prior bad act evidence relative to Crynock and Stewart. As to Crynock, the trial court reasoned that although Ross "was drinking at the time of the bad acts" and Ross "sexually assaulted Crynock", the "most telling difference between Crynock's allegation and the killing of [the victim] is the level of violence alleged does not rise to the level of violence that occurred either in the Miller killing or in the other women's allegations of prior bad acts." Trial Court Order, 9/20/05, at 5. The trial court determined "[t]his obvious lack of violence leaves us with no other decision then [sic] to bar Crynock from testifying in [Ross'] trial since the allegations of Crynock do not rise to the level of connection between her incident and the killing of Miller." *Id.*

As to Stewart, although the trial court deemed "the Commonwealth's proffered evidence of Stewart meets the threshold questions of admissibility", the trial court precluded evidence of Ross' bad acts against Stewart because "this Court finds the prior bad acts evidence Stewart submitted is more prejudicial than probative." *Id.* at 6. The trial court's preclusion was based on the fact that "Stewart alleges the bad acts perpetrated against her occurred thirteen (13) years ago in 1992. Furthermore, no judicial determination was ever made regarding these allegations. These bad acts simply occurred too long ago and lack the probative value to outweigh the unfair prejudice against [Ross] if this bad act evidence would be permitted into evidence." *Id.* at 6–7.

Given the trial court's well-reasoned and sound approach to the admission of evidence of Ross' prior bad acts, I disagree with the Majority's determination that the trial court abused its discretion in admitting the testimony of Berardinelli, Maloney, and Levine.

My review of the record reveals that Ross was convicted after a fair trial, due to the overwhelming evidence of his guilt, which included:

[E]vidence tending to prove . . .: that Ross had made statements to friends on the night of the murder that he "needed to get laid" and that they should "pull a train" (group sex) on [the victim]; that a beer bottle found at the scene, which Dr. Funke testified could have been the foreign object used to mutilate [the victim], was from a six-pack purchased earlier that night by Ross; that sneaker and boot prints at the scene matched shoes worn by Ross and [the victim]; that Ross had scrapes and scratches on his abdomen, legs, and groin that were consistent with a struggle; that the bite mark on [the victim]'s breast was consistent with Ross' dental impressions; and that Ross had confessed to a cellmate after his arrest.

Majority Opinion at 88–89.

Accordingly, finding no abuse of discretion by the trial court based on my review of the certified record in conjunction with cited authority, I would deny Ross' request for a new trial and affirm the judgment of sentence.