J. S67005/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| AKI JONES, | : | No. 3017 EDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, September 21, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0003683-2014

BEFORE:  FORD ELLIOTT, P.J.E., RANSOM, J. AND STEVENS, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED OCTOBER 25, 2016**

Aki Jones appeals from the September 21, 2015 aggregate judgment

of sentence of 25 to 50 years' imprisonment imposed after a jury found him

guilty of attempted murder, aggravated assault, witness intimidation, and

criminal conspiracy.[1]  After careful review, we affirm.[2]

The trial court summarized the lengthy factual background of this case

as follows:

> On November 22, 2010, on the 2400 block of
> Turner Street, in Philadelphia, after witnessing
> [appellant] place a gun to the head of a juvenile
> female, Michael Vessels called police.  Vessels also

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901, 2702, 4952, and 903, respectively.

[2] The Commonwealth has not filed a brief in this matter.

heard [appellant] shoot the gun into the air. [Appellant] was arrested the same day.

According to Tiffany Reid ([appellant's] girlfriend at the time), prior to [appellant's] preliminary hearing for the gun matter, [appellant] did not know the identity of the witness against him. [Appellant's] friend, Jay Thomas, was supposed to reach out to Troy Cooper (also known as "Taz") for information on the witness as Cooper and the witness lived on the same block.

On December 13, 2010, Vessels testified at a Preliminary Hearing against [appellant]. Reid, who was present at the hearing, informed [appellant] that she saw the witness there. At some point after the preliminary hearing, Cooper informed [appellant] of Vessels' name and address.

About a week after the preliminary hearing, Cooper approached Vessels and disclosed that the person arrested for shooting the gun was his friend. Cooper told Vessels that he did not need to go to court on this matter. In response, Vessels told Cooper that because he called 9-1-1 the day [appellant] was arrested, he felt obligated to go to court.

In March or April 2011, [appellant], while incarcerated, devised a plan to prevent Vessels from testifying against him. [Appellant] told Reid that, if need be, the witness would be harmed to prevent him from going to court. [Appellant's] plan involved Thomas, whose role was to find Vessels and kill him. At [appellant's] request, Reid contacted Thomas, and relayed that [appellant] said to "handle it," referring to the witness, [to] which Thomas replied, "I know, I got it."

In the subsequent months, Cooper approached Vessels numerous times about Vessels not testifying. In one conversation, Cooper told Vessels that [appellant's] girlfriend would provide $500 for Vessels not to testify. As the conversations about

not testifying increased, Vessels avoided Cooper by entering the neighborhood from different directions.

On September 19, 2011, [appellant], from prison, instructed Reid to call Thomas in a three-way call. During the three-way call, [appellant] stated, "Yeah, that's part one. Part one, I was away." Thomas replied, "Yeah. And now we got to get part two out of the way." At trial, Reid testified that "part two," which was always part of the plan, was to find Vessels and to shoot him to ensure that he did not go to court.

On September 23, 2011, in a recorded call between [appellant] and Reid, [appellant] stated "Jay [Thomas] gonna be on post." At trial, Reid testified that the term "post" meant that Thomas would wait for Vessels outside of his house to see whether he was going to court.

On this same date, in another phone call between Reid and [appellant], [appellant] instructed Reid to call Pop Hoagie (Charles Alexander). Reid testified that both [appellant] and Cooper knew Alexander from the neighborhood. Two days later, Alexander approached Reid at a basketball court and gave her $500. Approximately fifteen minutes after Reid collected the money, [appellant] and Reid discussed, in a recorded prison call, the money amount. [Appellant] then directed Reid to give the money to Cooper[.]

. . . .

On September 25, 2011, the day before Vessels was shot on the street, Reid took the money to Cooper's house. While at Cooper's house, Reid spoke with Shaheed Williams and exchanged phone numbers. (Reid testified at trial that [appellant] knew Williams as they were from the same neighborhood.) After exchanging numbers, Williams asked Reid to call him at 6:30 the next morning so that he could stand post outside Vessels' house.

- 3 -

Williams informed Reid that if he saw Vessels going to court, he would kill him.

On the same day that Reid dropped the money off to Cooper, Cooper approached Vessels outside his home and offered him the $500 not to appear in court. Cooper said, "they finally dropped it off," referring to the money. Vessels replied that he could not take it. Cooper responded with, "then it is whatever." Vessels testified at trial that he understood "whatever" to mean "anything goes" and that "if you don't do what I want you to do, then I'm going to do something to you."

The next day, September 26, 2011, at 6:30 a.m., Reid called Williams. Reid testified at trial that this was the wake-up call that Williams had requested so he could stand post outside Vessels' home. After the wake-up call, there were another four phone calls between Williams and Reid, from 7:06 and 9:11 a.m.

That morning, September 26, at around 9:30 a.m., Vessels left his house on the way to meet a member of his church. As he walked to the corner on the next block, Williams jumped out, immediately drew a silver revolver, and said, "You like to talk." Williams then placed the gun six inches from Vessels' face and pulled the trigger. Vessels blocked the shot with his wrist. Williams fired again, shooting Vessels in the side. After the second shot, Vessels took off running, with Williams in close pursuit. While Vessels ran, Williams fired several more shots, striking Vessels in his elbow and back, the latter of which knocked him to the ground. Williams then stood over Vessels, and said[,] "you won't talk no more," and shot Vessels in the neck.

Within a few minutes of the shooting, Williams called Reid at 9:45 a.m. At 9:56 a.m., Reid called Williams back. At 9:59 a.m., Reid sent a text message to Williams, followed by an exchange of several more text messages. Lastly, at 2:59 p.m., Reid called Williams.

On the same day, Reid also spoke with Williams in person. According to Reid, Williams informed her that Vessels did not go to court and described in detail how he had shot him. Williams told Reid that he spotted Vessels leaving his house, dressed like he was ready to go to court. Williams then ran around the corner, up a block, approached Vessels from behind, and shot him. Williams told Reid that Vessels had placed his hand in front of his face and was shot in the arm. He also told Reid that he shot Vessels five times, and that he tried to keep shooting, but the gun jammed.

On November 14, 2012, Vessels identified Williams from a photographic array as his shooter. At trial, Vessels again positively identified Williams.

On the same day Williams shot Vessels, Reid visited [appellant] at Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia. While [appellant] was not surprised about the shooting, he expressed some surprise that Williams was the shooter as it was his understanding that Thomas would [be] carrying out the shooting.

On February 14, 2012, the Bureau of Alcohol, Tobacco, Firearms ("ATF") executed a search warrant on Tiffany Reid's home. From her home, federal agents recovered a letter sent to Reid by [appellant] from prison. The letter was addressed to Lulu Blackchild. (Lulu is Reid's middle name and [appellant] sometimes referred to her by that name.) Written on the back of the letter was "The date is 5/25/11 and the last letter received from you is 5/18. Payback is fair." At trial, Reid testified that the handwriting was [appellant's]. Inside the envelope was a transcript of Vessel[s'] preliminary hearing testimony regarding the incident in which [appellant] had shot a gun into the air.

In March of 2014, Carla Reid received a letter at her home addressed to her daughter, Tiffany Reid. The letter was addressed from another prisoner, Jacque Walker, with a return address from the

Philadelphia prison system. [Appellant] was imprisoned with Walker in the same building at the CFCF, and in the same pod (Pod One), at the time the letter was postmarked (March 26, 2014). In the letter, the author threatened Tiffany Reid and her family. Although the letter was not in [appellant's] handwriting, the author referenced "Zaire" as his son–[appellant] and Reid's child–and referenced several of Reid's family members by name. The letter was also signed with "A.DoᴛᴛᴛᴛᴛᴛᴛᴛT," [appellant]'s nickname. After reading the letter, Carla Reid took it directly to the police.

Trial court opinion, 12/4/15 at 2-8 (citations to notes of testimony and footnotes omitted).

Appellant was arrested and charged with, **inter alia**, attempted murder, aggravated assault, witness intimidation, and criminal conspiracy in connection with this incident. On June 8, 2015, appellant proceeded to a jury trial alongside co-defendant Williams and was subsequently found guilty of the aforementioned offenses on June 15, 2015. On September 21, 2015, the trial court sentenced appellant to an aggregate term of 25 to 50 years' imprisonment. On September 23, 2015, appellant filed a post-sentence motion challenging the weight of the evidence. (**See** "Post Sentence Motion," 9/23/15 at 2-4.) The trial court denied appellant's post-sentence motion on September 30, 2015. Thereafter, on October 5, 2015, appellant filed a timely notice of appeal. On October 13, 2015, the trial court ordered appellant to file a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(b). Appellant filed his timely Rule 1925(b)

statement on November 3, 2015, and the trial court issued its Rule 1925(a) opinion on December 4, 2015.[3]

On appeal, appellant raises the following issues for our review:

1.	Did the trial court err and cause irreparable harm to [a]ppellant by permitting the Commonwealth to elicit irrelevant and highly inflammatory information regarding a prior crime wherein [a]ppellant was alleged to have held a gun to a teenage, female's head?

2.	Did the trial court err by admitting a letter that was purportedly written from [a]ppellant to Tiffany Reid which was not in [a]ppellant's handwriting, was addressed from another prisoner, and which contained threats when this letter was not authenticated in any legitimate way, was inflammatory, and caused irreparable harm to [a]ppellant?

3.	Did the trial court err by not striking the testimony of Tiffany Reid and by not precluding her from testifying because Ms. Reid was an admitted and repeated perjurer and was not competent to testify because she did not understand the solemnity of the oath?

4.	Did the trial court err in denying [a]ppellant's post-sentence motion because [a]ppellant's conviction is against the weight of the evidence?

5.	Is the evidence insufficient as a matter of law to convict [a]ppellant of conspiracy and, therefore, witness intimidation and attempted murder because he did not initiate the payment scheme to pay off [Vessels] and he did not conspire with anyone and involve

---

[3] We have elected to address appellant's sufficiency of the evidence and weight of the evidence claims in a different order than presented in his appellate brief.

> himself with any known person in initiating an
> overt act in furtherance of a conspiracy?

Appellant's brief at 4-5.

Appellant first argues that the trial court abused its discretion by permitting the Commonwealth to elicit testimony at trial that appellant was arrested on November 22, 2010 after Vessels observed him holding a gun to a juvenile female's head and called police. (**Id.** at 11; **see also** notes of testimony, 6/8/15 at 46-50; 6/9/15 at 34-36.) Appellant maintains that this inflammatory "prior bad act" evidence was inadmissible under Pennsylvania Rule of Evidence 404(b)(1) and caused irreparable harm to his case. (**Id.** at 12-13.) We disagree.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Fransen**, 42 A.3d 1100, 1106 (Pa.Super. 2012), **appeal denied**, 76 A.3d 538 (Pa. 2013) (citation omitted). "An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." **Commonwealth v. Antidormi**, 84 A.3d 736, 745 (Pa.Super. 2014), **appeal denied**, 95 A.3d 275 (Pa. 2014) (citation omitted).

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith." Pa.R.E. 404(b)(1); *see also Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa.Super. 2009), *appeal denied*, 986 A.2d 150 (Pa. 2009) (stating, "[e]vidence of distinct crimes is not admissible against a defendant being prosecuted for another crime *solely* to show his bad character and his propensity for committing criminal acts." (citation omitted; emphasis in original)). Evidence of prior bad acts may be admissible, however, "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Commonwealth v. Ross*, 57 A.3d 85, 98 (Pa.Super. 2012), *appeal denied*, 72 A.3d 603 (Pa. 2013) (citations omitted). Prior bad acts evidence "may also be admissible . . . in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa.Super. 2004) (citation omitted). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." *Ross*, 57 A.3d at 98 (citation omitted).

Upon review, we conclude that the testimony at issue was admissible because it was part of the sequence of events that formed the history of this case and was relevant to establish appellant's underlying motive for the witness intimidation charge. As noted, the record establishes that on

November 22, 2010, Vessels called police after he observed appellant place a gun to the head of a juvenile female and heard appellant discharge the gun into the air. (Notes of testimony, 6/9/15 at 28-36.) Following appellant's arrest, Vessels testified against appellant at his preliminary hearing. (Notes of testimony, 6/8/15 at 49-50.) Thereafter, appellant learned of Vessels' identity and conspired with several individuals to prevent Vessels from testifying against him, first by attempting to bribe him with $500, and then ultimately by devising a plan to have him murdered outside his home. (*See* notes of testimony, 6/9/15 at 189-98, 220-224, 233-234; 6/10/15 at 30-33, 202-212.)

Clearly, the evidence that Vessels observed appellant place a gun to a female juvenile's head was relevant to explain why appellant attempted to prevent him from testifying as a witness at trial, in addition to completing the story surrounding the incident. Accordingly, we discern no abuse of discretion on the part of the trial court in allowing this testimony to be admitted into evidence.

Appellant next argues that the trial court abused its discretion in "admitting a letter that was purportedly written from [a]ppellant to [Reid] which was not in [a]ppellant's handwriting, was addressed from another prisoner, and which contained threats as to the burning and killing of

[Reid's] family." (Appellant's brief at 14.)[4] Appellant avers that he is entitled to a new trial because this letter was "not authenticated in any legitimate way . . . and caused irreparable harm" to his case. (**Id.**) For the following reasons, we disagree.

"There are three basic types of evidence that are admitted into court: (1) testimonial evidence; (2) documentary evidence; and (3) demonstrative evidence." **Commonwealth v. McKellick**, 24 A.3d 982, 986 (Pa.Super. 2011), **appeal denied**, 34 A.3d 828 (Pa. 2011) (citation omitted). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). Evidence may be authenticated by circumstantial evidence, including both the "[t]estimony of a [w]itness with [k]nowledge . . . that an item is what it is claimed to be[,]" and/or "[t]he . . . contents . . . or other distinctive characteristics of the item, taken together with all the circumstances." Pa.R.E. 901(b)(1), (4) (emphasis omitted).

Contrary to appellant's contention, our review of the record in this matter reveals that this letter was properly authenticated. As the trial court aptly noted in its opinion,

> both Reid and her mother testified with relevant knowledge that, based on the letter's contents, [appellant] was its author. The letter's author not

---

[4] Reid was called as a witness by the Commonwealth and testified against appellant at trial. (**See** notes of testimony, 6/10/15 at 28-64.)

> only made several references to his son, Zaire—[appellant] and Reid's child—but also referenced, by name, several of Reid's family members. Further, [appellant's] nickname was signed at the letter's conclusion.
>
> Finally, the letter was sent from the same prison facility [where appellant] was incarcerated. Although the letter's return address suggested that the letter was from Jacque Walker, [appellant] and Walker were imprisoned at the same time the letter was post-marked (March 26, 2014), in the same building at the CFCF, and in the same pod (Pod One).

Trial court opinion, 12/4/15 at 11 (citations to notes of testimony omitted).

Furthermore, the record reflects that the trial court provided a cautionary instruction to the jury with regard to how the contents of this letter should be considered. Specifically, the trial court instructed the jury as follows:

> There was evidence tending to show that [appellant] made statements that could be considered threatening against the potential witness in this case. You know I'm talking about Tiffany Reid. If you believe that evidence, you may consider it as tending to prove [appellant's] consciousness of guilt. . . . You are not required to do so. You should consider and weigh this evidence, along with all the other evidence in the case.

Notes of testimony, 6/15/15 at 37-38.

Courts in this Commonwealth have repeatedly recognized that "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." ***Commonwealth v. Hairston***, 84 A.3d 657, 666 (Pa. 2014), ***cert. denied,***

135 S.Ct. 164 (2014) (citations omitted); *see also Commonwealth v. Sherwood*, 982 A.2d 483, 497-498 (Pa. 2009), *cert. denied*, 559 U.S. 1111 (2010) (finding that cautionary instructions were sufficient to overcome the prejudicial effect of prior bad acts evidence).  Jurors are presumed to follow the trial court's instructions.  *Commonwealth v. Elliott*, 80 A.3d 415, 445 (Pa. 2013), *cert. denied*, 135 S.Ct. 50 (2014).  Accordingly, we conclude that even assuming any potential prejudice may have resulted from the introduction of this letter at trial, it was cured by the trial court's limiting instruction to the jury.

Appellant next argues that the trial court abused its discretion by failing to strike the testimony of Commonwealth witness Tiffany Reid or preclude her from testifying because she acknowledged at trial that she had previously lied under oath when she stated that she did not know who shot Vessels.  (Appellant's brief at 16; *see also* notes of testimony, 6/10/15 at 125-126.)  Appellant avers that he is entitled to a new trial because Reid clearly "did not comprehend the solemnity of the oath[,]" and thus, was not competent to testify.  (Appellant's brief at 17-18.)

Competency relates to the "capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth."  *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014) (citation omitted).  "Generally, a witness is presumed competent to testify, and the burden falls on the objecting party to

demonstrate that a witness is incompetent." ***Id.***, quoting Pa.R.E. 601(b). As discussed, "[a]n appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the . . . determinations of witness competency, is abuse of discretion." ***Id.*** at 449 (citation omitted).

Upon review, we find that appellant's claim that Reid was not competent to testify is belied by the record. The record reflects that appellant's counsel cross-examined Reid at great length during his trial and impeached her with her prior inconsistent statements. (***See*** notes of testimony, 6/10/15 at 119-196.) The trial court, in turn, properly instructed the jury with regard to Reid's inconsistent statements, stating as follows:

> Now, in this case you have heard evidence that a witness or witnesses, and I am referring to . . . Ms. Reid made a statement on an earlier occasion that was inconsistent with their present testimony. You may, if you choose, regard this evidence as proof of the truth of anything that the witness said in the early statement. You may also consider this evidence to help you judge the credibility and weight of the testimony given by the witness at this trial. Once again, when you judge the credibility and weight of the testimony, you are deciding whether you believe the testimony and how important it is.

Notes of testimony, 6/15/15, at 31. Jurors, as noted, are presumed to follow the trial court's instructions. ***Elliott***, 80 A.3d at 445. Accordingly, we discern no abuse of discretion on the part of the trial court in failing to strike Reid's testimony or preclude her from testifying.

We now turn to appellant's claim that there was insufficient evidence to sustain his conviction for criminal conspiracy, and thus, his convictions for

witness intimidation and attempted murder cannot stand. (Appellant's brief at 22.) In support of this contention, appellant avers that, "he did not initiate the payment scheme to pay off [the victim] and he did not conspire with anyone and involve himself with any known person in initiating an overt act in furtherance of a conspiracy." (**Id.**) We disagree.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

**Commonwealth v. Thomas**, 988 A.2d 669, 670 (Pa.Super. 2009), **appeal denied**, 4 A.3d 1054 (Pa. 2010) (citations omitted).

Criminal conspiracy requires the Commonwealth to prove that appellant "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy." **Commonwealth v. Mitchell**, 135 A.3d 1097, 1102 (Pa.Super. 2016); **see also** 18 Pa.C.S.A. § 903(a). A conspiratorial agreement can be proven by circumstantial evidence and "inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of

and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Feliciano*, 67 A.3d 19, 26 (Pa.Super. 2013) (*en banc*), *appeal denied*, 81 A.3d 75 (Pa. 2013) (citation and internal quotation marks omitted). Additionally, "[t]he law is well-settled that conspirators are responsible for the actions of their cohorts, whether such conduct is planned by the consortium or engaged in by a conspirator without prior approval of the group." *Commonwealth v. Geiger*, 944 A.2d 85, 92 (Pa.Super. 2008), *appeal denied*, 964 A.2d 1 (Pa. 2009) (citations omitted).

Viewing the evidence in the light most favorable to the Commonwealth, the verdict winner, we agree with the trial court that there was ample evidence for the jury to conclude that appellant was guilty of criminal conspiracy, as well as witness intimidation and attempted murder. As the court explained in its opinion,

> [Appellant] conspired with Reid, Alexander, Williams, and Cooper with a shared criminal intent to prevent Vessels from testifying. Reid testified that it was [appellant's] plan from the very beginning for Vessels not to appear in court. The prison phone records corroborated her testimony as they illustrated [appellant] directing many of the plan's moving parts leading up to the shooting of Vessels. It was [appellant] who requested Reid to place a three-way call with Thomas, who discussed with [appellant] "part two" of the plan to have Vessels not testify. [Appellant] also told Reid that Thomas would stand "post" at Vessels' home. At trial, Reid testified that the term "post" meant that Thomas would wait for Vessels outside his home to see if he was going to court. It was also [appellant] who requested Reid

- 16 -

to call Alexander two days before Reid met with him to collect the bribe money. Within fifteen minutes after Reid collected the bribe money, [appellant] instructed her to give the $500 to Cooper.

. . . .

In this case, after Reid gave the money to Cooper—at [appellant's] direction—she exchanged numbers with Williams for a wake-up call so Williams could stand post at Vessels' home. The next morning, Reid called Williams to wake him. Later that morning, Williams shot Vessels five times. That Williams' shot Vessels on the morning of [appellant's] court date, and admonished Vessels— "You like to talk" and "you won't talk no more"— before shooting him, indicated that Williams acted in furtherance of [appellant's] conspiracy to have Vessels not testify.

That same day, when Reid informed [appellant] of the shooting, he only expressed some surprise on the identity of the shooter, not the shooting, as it was his understanding th[at] Thomas would shoot Vessels.

Trial court opinion, 12/4/15 at 15-17 (citations to notes of testimony omitted).

Based on the foregoing, appellant's claim that there is insufficient evidence to sustain his convictions for criminal conspiracy, witness intimidation, and attempted murder must fail.

Lastly, appellant argues that the verdict was against the weight of the evidence. (Appellant's brief at 18.) "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new

trial should be granted in the interest of justice." ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa.Super. 2006), ***appeal denied***, 911 A.2d 933 (Pa. 2006) (citation omitted). Weight of the evidence claims "are addressed to the discretion of the trial court." ***Commonwealth v. Galvin***, 985 A.2d 783, 793 (Pa. 2009), ***cert. denied***, 559 U.S. 1051 (2010) (citation omitted).

> [W]here the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Shaffer***, 40 A.3d 1250, 1253 (Pa.Super. 2012) (citation omitted).

Instantly, appellant contends the verdict is against the weight of the evidence because:

> (1) [Reid] never told anyone prior to trial, despite multiple statements and testimonies, that [a]ppellant said to kill [Vessels;] (2) [a]ppellant did not even know about [Williams] (the shooter) even after the shooting of [Vessels] had occurred[;] (3) [Williams] approached [Reid] and told her that he would take care of [Vessels] and [Reid] was [a]ppellant's only known connection to the non-prison world; (4) [t]he bribe to pay off the witness was initiated by someone else and [a]ppellant did not even know if [Vessels] was to be paid $500 or $5,000 and [a]ppellant states

> in a prison phone call "I do not know what the f[**k] is going on[;]" and (5) [a]ppellant did not know of [Williams'] involvement and another individual, Jay, never agreed with [appellant] to kill [Vessels].

Appellant's brief at 20-21 (citation to notes of testimony omitted).

Upon review, we discern no abuse of discretion on the part of the trial court in rejecting appellant's weight claim. "The trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Caban***, 60 A.3d 120, 132 (Pa.Super. 2012), ***appeal denied***, 79 A.3d 1097 (Pa. 2013) (citation omitted). Here, the jury evidently found the Commonwealth's witnesses credible and elected not to believe appellant's version of the events. We are precluded from reweighing the evidence and substituting our judgment for that of the fact-finder. ***Clay***, 64 A.3d at 1055. Accordingly, appellant's weight claim must fail.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/25/2016