J-S06041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KAREEM GRAHAM | : | |
| | : | |
| Appellant | : | No. 3003 EDA 2017 |

Appeal from the Judgment of Sentence January 6, 2014
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0010090-2012,
CP-51-CR-0010091-2012

BEFORE:  PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    Filed: April 22, 2021

Kareem Graham (Graham) appeals from the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County (trial court) after being convicted of aggravated assault, conspiracy and various firearms offenses.  On appeal, Graham challenges (1) the admission of other crimes evidence under Pa.R.E. 404(b), and (2) the legality of his sentence.  After review, we reject Graham's evidentiary challenge but agree that his sentence is illegal based on subsequent case law.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

This case involves two shootings that happened hours apart in Philadelphia on March 20, 2012. Under the Commonwealth's version of events, the shootings were part of an ongoing feud between two groups: "5th Street South" and "5th Street North." The Commonwealth believed that Graham was associated with several "5th Street South" members that were targeted in the first shooting. In the Commonwealth's view, the first shooting was committed by "5th Street North" members. As retaliation for the first shooting, Graham committed the second shooting just a few hours later.

The first shooting happened around 3:30 p.m. At that time, several members of the "5th Street South" group were standing outside a South Philadelphia corner store at 5th and Pierce Streets, which, according to the Commonwealth, was inside the group's "territory." The store's surveillance footage showed Graham walk out of a nearby house and enter the store moments before the shooting. Graham stopped and briefly spoke with the group members before walking away. After he leaves, someone walked up and began firing at the group, striking three of the men standing outside: Edwin Castro, Terrell Brown and Tyrone Gilliard. The three men survived but were either unable or unwilling to identify the shooter. Though no charges were ever filed, the police suspected "5th Street North" members of committing the shooting.

A few hours later, around 9:00 p.m., Graham went to a park less than a mile from the first shooting but in "5th Street North" territory. At the time, children were still playing in the park's playground and basketball court. After entering the park, Graham pulled out a handgun and began firing. Though Graham's target was not clear, two minors were struck by bullets: a 12-year-old boy (Z.W.) and a 15-year-old girl. Both received medical treatment at a local hospital but were not seriously injured.

After firing all the rounds in his gun, Graham ran to a waiting green Buick sedan that sped away as soon as he got in. A nearby witness, however, got a partial plate description and called 911. Based on the information, the police set up surveillance of an address where the car had been seen. Although the car was not there, the police saw two "5th Street South" members walk up the street. The first, Andre Ware (Ware), was at the first shooting but was unharmed. The second, Vincent Thornton (Thornton), was not at the first shooting but went to the hospital to visit the victims; he was also the registered owner of the green Buick sedan seen leaving the second shooting.

As the two men walked up the street, Ware ducked into a backyard and quickly reemerged, at which point the police arrested both him and Thornton. The police checked the backyard and found a black .380 handgun with an empty magazine. The police later matched the handgun to the fired cartridge casings found at the shooting at the park.

That same night, the police interviewed Z.W. but he could not identify the shooter. Not long after, the police received information that Graham was the shooter at the park. Based on this, the detectives compiled a photo array that included Graham's picture. The next day, the police showed the photo array to Z.W. When shown the photo array, Z.W. identified Graham as the shooter in the park.[1] Graham was arrested two weeks later and had his DNA taken for testing. Testing later matched Graham's DNA - along with Ware and a third unidentified male - to a DNA sample taken from inside the handle of the .380 handgun that was matched to the second shooting.

The Commonwealth filed a pretrial motion *in limine* under Pa.R.E. 404(b) to admit evidence about the first shooting and Graham's association with "5th Street South" members, asserting that the evidence was necessary to explain Graham's motive for the second shooting. At the hearing on the motion, the Commonwealth presented Officer James O'Neill, who was assigned to a gang task force focused on South Philadelphia. He testified that there has been continual shooting and arrests between "5th Street South" and "5th Street North" since 2009, detailing several shootings that he claimed were part of the ongoing feud between the groups.

---

[1] Z.W. also identified Graham as the shooter at the preliminary hearing. The Commonwealth relied on these identifications at trial when Z.W. could neither identify the shooter nor remember the prior identifications.

Turning to Graham, Officer O'Neill testified that he knew him from the "5th Street South" area and "from who his friends and associates are and who he hangs out with." These associates included several self-admitted "5th Street South" members, including both Ware and Thornton, as well as one of the victims of the first shooting, Terrell Brown. Officer O'Neill then testified about the first shooting and the surveillance footage from the corner store. Though the video was not shown, Officer O'Neill related that it showed Graham walk into and exit the store just before the shooting. Over Graham's objection, Office O'Neill testified that a "5th Street North" member was suspected of committing the shooting but was never charged. Office O'Neill further stated that "intelligence suggested" that this suspect was the intended target of the second shooting.

Besides Officer O'Neill's testimony, the Commonwealth argued that the proposed evidence would tie in with the recovery of the handgun used to commit the shooting in the park. On this point, the Commonwealth emphasized that the handgun was recovered after being discarded by Ware, who was at the first shooting but unharmed. The Commonwealth also highlighted that Thornton was with Ware when he discarded the handgun and had been at the hospital earlier in the day to see the victims of the first shooting.

Graham countered with two main points. First, though Graham "associated" with self-admitted "5th Street South" members, there was no

evidence that he had ever identified himself as being part of the group. Second, the surveillance video merely showed that Graham spoke to the men briefly before leaving the corner store, which is not necessarily proof that he was a member of "5th Street South."

The trial court granted the Commonwealth's Rule 404(b) motion, finding that the testimony was appropriate to show proof of motive or intent or a common plan. As a result, in addition to presenting the identification and DNA evidence described above at trial, the Commonwealth called Officer O'Neill as a witness. During his testimony, the trial court sustained Graham's objection when Officer O'Neill testified that Graham was a "5th Street South" associate. However, Graham did not object when Officer O'Neill testified that he had seen Graham with several "5th Street South" members, including Ware and Thornton.

At the end of trial, the jury found Graham guilty of two counts of aggravated assault and one count each of conspiracy to commit aggravated assault, firearms not to be carried without a license, carrying firearms in Philadelphia and possession of an instrument of crime. After the jury rendered its verdict, the trial court found him guilty of persons not to possess firearms.

At the January 6, 2014 sentencing, the trial court imposed an aggregate sentence of 21 to 42 years' imprisonment followed by three years' probation. The court's sentence was comprised of 5 to 10 year consecutive sentences each for the aggravated assault convictions; a consecutive 5 to 10 years for

conspiracy; a consecutive 2½ to 5 years for persons not to possess firearms; and a consecutive 3½ to 7 years firearms not to be carried without a license. Because of the victims' ages, the sentences imposed for aggravated assault and conspiracy were mandatory minimum sentences under the former version of 42 Pa.C.S. § 9718.

Graham did not file a direct appeal. However, in January 2015, he filed a post-conviction petition to request reinstatement of his direct appeal rights *nunc pro tunc*, which the trial court later granted in August 2017. Graham filed a timely notice of appeal and now raises two issues for our review.

> 1. Did the trial court err in granting he Commonwealth's motion to introduce evidence of other acts, crimes, or wrongs under Rule 404(b)?
>
> 2. Did the sentencing court err in sentencing [Graham] to mandatory minimum sentences for aggravated assault and criminal conspiracy?

Graham's Brief at 3.

## II.

In his first issue, Graham challenges the trial court's decision to admit other crimes evidence under Pennsylvania Rule of Evidence 404(b).[2] Rule 404(b) provides in relevant part:

---

[2] When reviewing a trial court's decision to grant or deny a motion *in limine*, our standard of review is as follows:

> [W]e apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of

- 7 -

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

Our Supreme Court has provided the following guidance:

Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

***Commonwealth v. Sherwood***, 603 Pa. 92, 982 A.2d 483, 497 (2009).

Moreover,

---

the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

***Commonwealth v. Danzey***, 210 A.3d 333, 337 (Pa. Super. 2019). When an appellant challenges the ruling on a motion *in limine*, our scope of review is limited to the relevant pretrial hearing transcripts. ***In re L.J.***, 79 A.3d 1073, 1088-1089 (Pa. 2013) (noting that our scope of review is limited to the evidence presented at the pretrial hearing).

> The purpose of Rule 404(b)(1) is to prohibit the admission of evidence of prior bad acts to prove "the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). While Rule 404(b)(1) gives way to recognized exceptions, the exceptions cannot be stretched in ways that effectively eradicate the rule. With a modicum of effort, in most cases it is possible to note some similarities between the accused's prior bad conduct and that alleged in a current case. To preserve the purpose of Rule 404(b)(1), more must be required to establish an exception to the rule—namely a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question. [...T]his Court has warned that prior bad acts may not be admitted for the purpose of inviting the jury to conclude that the defendant is a person "of unsavory character" and thus inclined to have committed the crimes with which he/she is charged.

*Commonwealth v. Ross*, 57 A.3d 85, 104-105 (Pa. Super. 2012) (en banc) (citations omitted).

As noted above, the Commonwealth relied on the motive exception in its pretrial motion to admit the other crimes evidence under Rule 404(b). Regarding the motive exception, this Court has observed:

> The mere identification of similarities between the prior bad acts and the crime at issue ... does not establish motive. Instead, ... there must be a firm basis for concluding that the crime currently on trial "grew out of or was in any way caused by the prior set of facts and circumstances."

*Id*. at 101 (internal citations omitted).

With these principles in mind, we turn to Graham's argument. First, he attacks the Commonwealth's evidence at the pretrial hearing, arguing that it was too speculative to conclude that the shootings were connected as part of an "on-going gang war." On this point, he emphasizes that Officer O'Neill testified only that he had "intelligence" that the first shooting was connected

- 9 -

to the second because a "5th Street North" member committed the first. Graham, however, notes that Officer O'Neill did not divulge the source for his "intelligence" that a "5th Street North" member committed the first shooting. By failing to do so, Graham argues, his assertion that the shooting was "gang-related" was unreliable and lacked probative value. Graham's Brief at 12-13.

Turning to prejudice, Graham argues that the evidence of the first shooting and the history of violence between the two groups was unfairly prejudicial, especially since he was allegedly affiliated with one of the groups. In his view, this evidence invited the Commonwealth to make its decision not on the evidence of the specific crime, but instead on unrelated violent crimes committed by the feuding groups. *Id*. at 13.

As an initial matter, notwithstanding its grant of the 404(b) motion, the trial court sustained an objection at trial to Officer O'Neill's testimony that Graham was a "5th Street South" associate. While the Commonwealth linked him to several people involved in the case that were identified as "5th Street South" members, Graham was never directly identified as a member. Graham did not object when Officer O'Neill testified that he had seen Graham with several "5th Street South" members, including Ware and Thornton. At trial, Graham was not identified as a "5th Street South" member, making his claim of unfair prejudice on that basis meritless.

That said, the issue then becomes if Graham incurred unfair prejudice because the trial court allowed the evidence of the previous shooting to

establish motive. In making that determination, the trial court must balance the potential for unfair prejudice against the probative value of the evidence, which, in this case, was to prove motive. Even when not an element of the offense, evidence of motive is always relevant in a criminal case. ***Commonwealth v. Gwaltney***, 442 A.2d 236, 241 (Pa. 1982).

Here, the evidence had probative value to prove that the shooting in the park was connected to the first shooting rather than a random act of violence. Significantly, Graham did not object to the Commonwealth's evidence that the victims of the first shooting were "5th Street South" members. Additionally, the Commonwealth's evidence was that Ware and Thornton were together when they attempted to discard the gun used in the second shooting, and that both men were "5th Street South" members that Graham knew. Thus, the trial court did not abuse its discretion in finding that the Commonwealth presented enough evidence at the pretrial hearing that Graham's motivation to commit the shooting in the park was connected to him knowing the "5th Street South" members that were shot just hours earlier.

In addition to showing motive, the evidence was also admissible under the *res gestae* exception, also referred to as the "same transaction" exception.

> This exception is applicable in "situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development." In other words, the exception applies to prior bad acts "which are so clearly and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances, and so could not be excluded on the presentation of the case before

- 11 -

the jury without the evidence being rendered thereby unintelligible."

***Commonwealth v. Knoble***, 188 A.3d 1199, 1205 (Pa. 2018) (internal citations omitted).

Besides the temporal and geographic proximity of the two shootings, there were additional facts tying the two events together. Significantly, Ware was present at the first shooting and escaped unscathed. Then, shortly after the second shooting, the police found him discarding the .380 handgun that was just used in that shooting. Similarly, not long after visiting the victims of the first shooting, Thornton was arrested with Ware after he tried to discard the gun used in the second shooting. Moreover, Thornton was the owner of the green Buick sedan tied to the second shooting. All of this information, taken together, falls under the *res gestae* exception and explained the chain of events that formed the history of the case. Accordingly, we find the trial court did not abuse its discretion in granting the Commonwealth's motion *in limine* to admit evidence about the first shooting being Graham's motivation for committing his offenses.[3]

---

[3] Graham adds two discrete claims onto his evidentiary challenge. In the first, he argues that the trial court erred in allowing Officer O'Neill to testify to his specialized knowledge and experience, even though he was never qualified as an expert. Graham's Brief at 13-14. We are unable, however, to find that Graham ever raised this objection during either the pretrial hearing or trial. The argument is waived. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Even if preserved, we find no error because Officer O'Neill testified at trial based on

**III.**

In his other issue, Graham contends the trial court illegally sentenced him by imposing consecutive mandatory minimum sentences based on 42 Pa.C.S. § 9712. That provision provided for the imposition of mandatory minimum sentences based on factual predicates determined by a trial court by a preponderance of evidence standard. However, in *Alleyne v. United States*, 570 U.S. 99 (2013), the United States Supreme Court held that any fact that increases the mandatory minimum sentence is an element that must be submitted to a jury and found beyond a reasonable doubt. Following *Alleyne*, this Court has held that mandatory minimum sentences imposed under Section 9712 are illegal. *See Commonwealth v. Valentine*, 101 A.3d 801, 812 (Pa. Super. 2014).

The Commonwealth agrees with this request and acknowledges that Graham was sentenced under a provision that has since been declared

_____

his personal knowledge and observations of Graham and the other men involved in the shootings.

We also find no merit in Graham's other claim added onto his 404(b) argument, namely, that the trial court erred in failing to give the jury a limiting or cautionary instruction about the evidence. Graham's Brief at 14. Again, however, it does not appear that Graham ever requested such an instruction or if he did, that the trial court refused to give one. For this reason, the argument is waived. *See Commonwealth v. Schoff*, 911 A.2d 147, 158 (Pa. Super. 2006) ("[A] defendant must make a timely and specific objection at trial or face waiver of h[is] issue on appeal. Failure to request a cautionary instruction upon introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction.").

unconstitutional. Likewise, the trial court asks that we remand for resentencing for all of the stated reasons. Consequently, with the agreement of everyone involved, we vacate Graham's judgment of sentence and remand for resentencing without application of the mandatory minimum.

Convictions affirmed. Judgment of sentenced vacated. Case remanded for resentencing. Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 4/22/21*